# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

ANTONIO RODRIGUEZ-PRECIADO, aka
Tony Rodriguez-Preciado,
    *Defendant-Appellant.*

No. 03-30285

D.C. No.
CR-96-00311-
ALH-(2)

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
September 13, 2004—Portland, Oregon

Filed March 4, 2005
Amended July 29, 2005

Before: J. Clifford Wallace, Ronald M. Gould, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Wallace;
Partial Dissent by Judge Berzon

**COUNSEL**

James F. Halley, Portland, Oregon, for the defendant-appellant.

Karin J. Immergut, United States Attorney, and J. Russell Ratto, Special Assistant United States Attorney, Portland, Oregon, for the plaintiff-appellee.

**ORDER**

The court's majority opinion filed March 4, 2005, slip op. 2539, and appearing at 399 F.3d 1118 (9th Cir. 2005), is hereby amended as follows:

1. On page 2544, line 9, replace "We affirm." with "We affirm, but issue a limited remand pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc)."

2. On page 2562, line 3, delete "**AFFIRMED**" and add a new Section V reading as follows:

We now address the impact of the recent en banc decision in *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en

banc) on this case. Because we cannot "reliably determine from the record whether the sentence imposed would have been materially different had the district court known that the Guidelines were advisory, we will remand to the sentencing court to answer that question." *Id.* at 1084. The mandate shall issue forthwith.

**AFFIRMED IN PART, REMANDED IN PART.**

---

**OPINION**

WALLACE, Senior Circuit Judge:

Rodriguez-Preciado appeals from his conviction for various narcotics-related offenses. He argues that the district court improperly denied his pre-trial motion to suppress evidence obtained from his person, his motel room, and his vehicle, as well as statements that he made in the motel room and during a subsequent two-day interrogation. In support of these claims, he contends that the officers did not obtain a valid consent to enter and search the motel room, and that they began a custodial interrogation of him in the motel room without giving the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436 (1966). Furthermore, he argues he did not validly waive his right to remain silent after he was eventually given *Miranda* warnings, the warnings became "stale" and should have been re-administered at the outset of the second day of interrogation, and the officers' failure to advise him of his right under Article 36 of the Vienna Convention requires suppression. He also contends the officers did not obtain a valid consent to search his person and vehicle, and these searches exceeded the scope of any consent. In addition to these suppression arguments, he asserts that the district court violated the Speedy Trial Act, 18 U.S.C. § 3161(c)(1), and that the prosecutor improperly commented on his failure to testify, in violation of *Griffin v. California*, 380 U.S. 609 (1965).

The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm, but issue a limited remand pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc).

## I.

An ongoing narcotics investigation led law enforcement officers to an Oregon motel room in search of Rodriguez-Preciado, who was suspected to be involved in drug trafficking. The officers had questioned Robert Glenn, another target of the investigation, and learned that Rodriguez-Preciado could be found at the motel room and would have contraband in his car.

Five officers arrived at the motel without a warrant. At least three officers went to the motel room door dressed in plain clothes and carrying concealed weapons, including Officer Hascall and Deputy Lilley. They knocked on the door and a man, later identified as Alberto Silva, answered. While standing outside the door, Hascall displayed his badge, identified himself as a police officer, and asked Silva whether he understood English. Silva replied that he did not. Hascall spoke some Spanish and stated in Spanish that he was a police officer and asked for permission to enter the room. Silva said "Si," backed away from the door, and motioned with his arms for the officers to enter the room. Hascall also asked Silva in Spanish whether the motel room was his; Silva replied that it was.

Once inside the room, Hascall explained that the officers were there to investigate suspected narcotics sales activity. He asked Silva whether he sold narcotics, and Silva said he did not. Hascall then asked Silva for permission to search the room for drugs. Silva consented. Throughout this conversation, none of the officers had their hands on their weapons, and Silva was not handcuffed or otherwise detained. At no

point did the officers give Silva *Miranda* warnings, explain that he had the right not to consent to the search, or state that they could obtain a search warrant for the motel room. The officers found no drugs or weapons during the search, but they did find, among other things, a shipping label addressed to Glenn's business and a fax from Glenn.

Rodriguez-Preciado entered the motel room while the officers were still there. Hascall displayed his badge, told Rodriguez-Preciado that he and the others were police officers, and asked Rodriguez-Preciado whether he understood English. Rodriguez-Preciado said that he did, so Hascall explained that the officers were there to investigate narcotics activity, that Silva had consented to a search of the room, and that the search had not produced "any weapons or drugs or anything." During this conversation, the officers did not display or touch their weapons, and did not surround, pat down, or handcuff Rodriguez-Preciado. Rodriguez-Preciado expressed no objection to either the officers' presence in the room or that Silva had consented to the search.

Hascall then asked Rodriguez-Preciado whether he had any drugs in his possession. Rodriguez-Preciado said yes and produced a small paper bindle of cocaine from his shirt pocket. Hascall immediately advised Rodriguez-Preciado of the required *Miranda* warnings and asked whether Rodriguez-Preciado understood them. Rodriguez-Preciado said that he did. Hascall did not inform Rodriguez-Preciado of any right that he, as a Mexican national, might have under the Vienna Convention.

After Hascall requested permission to search Rodriguez-Preciado's person and his vehicle, Rodriguez-Preciado consented and handed him the keys to the van he had been driving. Rodriguez-Preciado said the van contained no weapons or drugs. Sergeant Romanaggi searched the van and discovered $3,360 hidden in a child safety seat in the van. Hascall also found $1,849 in cash in Rodriguez-Preciado's wallet.

Based on this and other evidence, the officers decided to interview Rodriguez-Preciado in more detail. He was handcuffed and taken to a Washington County Sheriff's Office substation. When he arrived at the interview room, his handcuffs were removed and Hascall and Lilley began questioning Rodriguez-Preciado, primarily about his relationship with Glenn. During that conversation, Rodriguez-Preciado described several instances in which he had sold marijuana and methamphetamine to Glenn, including a sale of one pound of methamphetamine that had occurred several days earlier. Rodriguez-Preciado also described a failed attempt to obtain the drug "ecstasy" for Glenn (the slang term for a drug known as MDMA or MDA), and a sale of five kilograms of cocaine to another individual.

According to Hascall, the officers' conversations with Rodriguez-Preciado at the motel room and while he was being interrogated at the substation were conducted entirely in English. Hascall testified the officers had "no difficulty" communicating with Rodriguez-Preciado, with the exception of some initial confusion about the meaning of the word "methamphetamine." This confusion was dispelled after Rodriguez-Preciado later asked the officers whether they meant "crystal," which is the slang term for methamphetamine.

At one point in the interview, the officers asked Rodriguez-Preciado, "Where is the rest of the meth?" Rodriguez-Preciado replied that a pound of methamphetamine was behind the rear speaker of the van. The record is not clear whether Hascall specifically sought Rodriguez-Preciado's permission to search that area of the van. Hascall informed Romanaggi, who dismantled the rear speaker and found one pound of methamphetamine. Earlier searches of the van, including a canine search, had not uncovered the methamphetamine or any other contraband.

The officers then asked Rodriguez-Preciado whether he would be "interested in helping [them] with [their] investiga-

tion of narcotics trafficking and perhaps help himself at the same time." Rodriguez-Preciado said that he was interested, which led to a discussion of various ways in which he might be of service. When the officers ended their interview, they placed Rodriguez-Preciado in custody on state narcotics charges and moved him to the Washington County jail, where he spent the night.

Lilley came to the jail the next day to resume the interview with Rodriguez-Preciado. Lilley was accompanied by Romanaggi, who understood that Rodriguez-Preciado wished to cooperate. The officers did not re-advise Rodriguez-Preciado of the *Miranda* warnings before initiating this interview, which began approximately sixteen hours after he was given *Miranda* warnings the previous day. Rodriguez-Preciado discussed various drug transactions in which he had engaged in the past, and gave the names of individuals he had worked with or who he understood to be involved in the drug trade. As before, the entire interrogation took place in English.

At some point in the questioning, Romanaggi asked Rodriguez-Preciado whether "he remembered receiving his *Miranda* rights when he was interviewed the night before by Officer Hascall." Rodriguez-Preciado responded that he "thought he had" been advised of his rights. Romanaggi gave Rodriguez-Preciado a card reciting *Miranda* warnings in both English and Spanish. Rodriguez-Preciado appeared to read the card, and then stated, in response to a question by Romanaggi, that "he understood his rights." Romanaggi "then went over everything" he had previously asked Rodriguez-Preciado.

A grand jury charged Rodriguez-Preciado with one count of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine, cocaine, MDMA and MDA, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2; one count of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and one count of posses-

sion with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1). After failing to appear at his arraignment, Rodriguez-Preciado was re-captured over four years later. The trial date was delayed several times due to continuances granted by the district court. Rodriguez-Preciado never filed a motion to dismiss the case pursuant to the Speedy Trial Act.

The district court held a pretrial hearing on Rodriguez-Preciado's motion to suppress, in which he asserted constitutional and other violations and sought to exclude from trial the evidence found in the motel room, the cocaine he gave to Hascall in the motel room, the money found in the van and on his person, the methamphetamine found in the van, and all statements that he made in the motel room and during the two-day interrogation. The district court denied the motion. After a four-day trial, the jury found Rodriguez-Preciado guilty of all three counts.

## II.

We first address Rodriguez-Preciado's motion to suppress. We review the district court's denial of the motion to suppress de novo and the underlying factual findings for clear error. *United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

## A.

Rodriguez-Preciado's first claim is that the officers unlawfully entered and searched the motel room. He contends the district court clearly erred in finding Silva validly consented to their entry and search.

"We . . . review the validity of the warrantless entry and warrantless search under the clearly erroneous standard," *United States v. Rosi*, 27 F.3d 409, 411 (9th Cir. 1994), including the district court's factual finding that Silva voluntarily and knowingly consented to the search. *United States v.*

*Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004). "It is the government's burden to prove that the consent was freely and voluntarily given. On appeal, evidence regarding the question of consent must be viewed in the light most favorable to the fact-finder's decision." *Id.* (internal quotation marks and citations omitted).

The district court found that Silva knowingly consented to the entry and search: "Silva did invite Officer Hascall into the room and gave consent for the search," notwithstanding Silva's inability to speak English and Hascall's limited Spanish. That finding was not clearly erroneous.

In addition, the district court found the consent was voluntary. Regarding the consent to the entry, the finding of voluntariness of consent was not clearly erroneous in light of evidence that Silva welcomed the officers into the room. Regarding the consent to search, voluntariness "is 'to be determined from the totality of all the circumstances,' " *id.*, *quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973), although we can examine five nonexclusive issues assisting our inquiry:

> (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.

*United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002), *citing United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989). "[T]hese factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry." *Patayan Soriano*, 361 F.3d at 502.

**[1]** As Silva was not in custody, "*Miranda* warnings were inapposite." *Id.* at 504. The officers did not draw their guns

or threaten to obtain a search warrant if consent was refused. Furthermore, Hascall testified that after he asked Silva in Spanish whether the officers could enter the room, Silva said "si" and motioned for the officers to enter. Although Silva was not advised he could withhold consent or told a search warrant could be obtained, "[i]t is not necessary to check off all five factors." *Id.* at 502. Given these circumstances, the district court did not clearly err in finding that Silva knowingly and voluntarily consented to the search. *See United States v. Cormier*, 220 F.3d 1103, 1112-13 (9th Cir. 2000) (affirming voluntariness finding in similar circumstances).

The district court also found that Silva had authority to invite the officers into the room. We will not review that determination because Rodriguez-Preciado did not "specifically and distinctly" challenge it in his opening brief. *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985).

B.

Next, Rodriguez-Preciado argues that the statements he made should have been suppressed because of alleged *Miranda* violations. He contends that the statements he made before being given warnings were taken in violation of *Miranda* because he was in "custody" for purposes of *Miranda* from the moment he entered the motel room. Furthermore, he asserts he did not validly waive his *Miranda* rights after they were given to him because his difficulty with English precluded a knowing and intelligent waiver, and the "coercive effect of the officers' presence in [his] motel room" rendered his waiver involuntary. Finally, he argues the *Miranda* warnings he was given at the motel room were "stale" by the beginning of the interrogation the next day, due to changed circumstances. We address each contention in turn.

1.

The district court determined that "when [Rodriguez-Preciado] arrived at the room, he was not in custody." We review the custody determination de novo and the underlying factual findings for clear error. *See United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). As we recently explained:

> An officer's obligation to administer *Miranda* warnings attaches only where there has been such a restriction on a person's freedom as to render him in custody. Whether a suspect is in custody turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position.

*United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (internal quotation marks, citations, and alterations omitted).

**[2]** Judged by these standards, the district court did not err in concluding that Rodriguez-Preciado was not in custody when he entered the motel room. The officers explicitly informed him that their search had turned up no incriminating evidence, none of them displayed or otherwise brought attention to their weapons, and there was no intimation that they would not permit him to leave if he so desired. Rodriguez-Preciado's admission to possessing cocaine was not made during a custodial interrogation, and therefore the fact that he was not given *Miranda* warnings prior to this admission does not require suppression.

2.

Rodriguez-Preciado also challenges the determination that he validly waived his *Miranda* rights by responding to the

officers' questions after receiving the required warning. Waivers of *Miranda* rights need not be explicit; a suspect may impliedly waive the rights by answering an officer's questions after receiving *Miranda* warnings. *Terrovona v. Kincheloe*, 912 F.2d 1176, 1179-80 (9th Cir. 1990). "For a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given. Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc) (internal quotation marks and citations omitted). "We review a district court's ruling on a *Miranda* waiver under two standards: Whether the waiver was knowing and intelligent is a question of fact that we review for clear error. Whether the waiver was voluntary is a mixed question of fact and law, which we review de novo." *United States v. Amano*, 229 F.3d 801, 803 (9th Cir. 2000).

**[3]** The district court's finding that Rodriguez-Preciado's alleged difficulty with English did not prevent him from knowingly and intelligently waiving his *Miranda* rights was not clearly erroneous. "A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Doe*, 155 F.3d at 1074, *quoting Moran v. Burbine*, 475 U.S. 412, 421 (1986). Rodriguez-Preciado "indicated that he understood his rights after they were explained to him," *United States v. Bautista-Avila*, 6 F.3d 1360, 1366 (9th Cir. 1993), and the district court found that, except for some confusion regarding the word "methamphetamine," there was "no indication by any of the officers that Mr. Rodriguez had difficulty understanding English nor that the officers had trouble understanding his English." Thus, "[d]espite [any] language difficulties encountered by appellant, the evidence seems to indicate that he understood his rights and . . . knowingly, and intelligently waived them." *United States v. Bernard S.*, 795 F.2d 749, 752 (9th Cir. 1986).

**[4]** The district court also concluded that Rodriguez-Preciado's choice to waive his *Miranda* warnings was voluntary. "A waiver is voluntary if, under the totality of the circumstances, the confession was the product of a free and deliberate choice rather than coercion or improper inducement." *Doe*, 155 F.3d at 1074. Rodriguez-Preciado points to no facts, other than the mere presence of officers in his motel room, suggesting that his waiver of *Miranda* warnings was involuntary. Indeed, we have upheld the validity of a waiver of *Miranda* warnings in circumstances much more coercive than those involved in this case. *See Terrovona*, 912 F.2d at 1179-80 (not specifically addressing issue of voluntariness, but holding that suspect validly waived his *Miranda* rights by speaking to officers, despite fact that questioning occurred in suspect's apartment after he had been handcuffed and arrested without a warrant and while officers were conducting what he "considered to be a warrantless search of his apartment"). Here, we have a milder situation: the officers told Rodriguez-Preciado that their search of the room had not produced any weapons or drugs. The mere fact that he was questioned in the motel room "was not 'sufficiently compelling to overbear [Rodriguez-Preciado's] will in light of all attendant circumstances.' " *United States v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002), *quoting United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). Nor is there any evidence of coercion or improper inducement at either the first or second custodial interview. In these circumstances, the conclusion that Rodriguez-Preciado's waiver of *Miranda* rights was voluntary was not erroneous.

3.

We now address the admissibility of statements made on the second day of the interrogation. Rodriguez-Preciado contends that the officers were required to re-advise him of *Miranda* warnings before beginning the second day of questioning. But he does not cite a Supreme Court or Ninth Circuit decision—and we are aware of none—holding that statements

made after *Miranda* warnings are administered are nonetheless inadmissible if the warnings become "stale."

**[5]** The Supreme Court has eschewed per se rules mandating that a suspect be re-advised of his rights in certain fixed situations in favor of a more flexible approach focusing on the totality of the circumstances. *See Wyrick v. Fields*, 459 U.S. 42, 48-49 (1982) (per curiam) (rejecting per se rule requiring police to re-advise suspect of his rights before questioning him about results of polygraph examination). Consistent with *Wyrick*'s admonition against "unjustifiable restriction[s] on reasonable police questioning," *id.* at 49, "[t]he courts have generally rejected a per se rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995). Indeed, in a decision upholding the admissibility of statements made nearly fifteen hours after *Miranda* warnings were administered, *see Guam v. Dela Pena*, 72 F.3d 767, 770 (9th Cir. 1995), we cited with approval earlier decisions involving intervals of two days, *id.*, *citing Puplampu v. United States*, 422 F.2d 870 (9th Cir. 1970) (per curiam), and three days, *id.*, *citing Maguire v. United States*, 396 F.2d 327, 331 (9th Cir. 1968).

**[6]** Here, the district court found that Rodriguez-Preciado's second day statements were "close in time to the original advice of rights," despite the interval of approximately sixteen hours, and that he "understood those rights as given to him in English." In light of our precedents approving delays of similar and greater length, it properly concluded that it was "not [necessary] that he be advised of his rights" again. *See, e.g.*, *Andaverde*, 64 F.3d at 1313 (statements made one day after *Miranda* warning).

**[7]** Nor has Rodriguez-Preciado pointed to any other circumstances which "suggest the effectiveness of the earlier *Miranda* warnings was diminished" on the second day of the interrogation. *Dela Pena*, 72 F.3d at 770. "A rewarning is not

required simply because there is a break in questioning." *Id.* at 769. Although Romanaggi took Hascall's place at the second interrogation, Lilley was present at both custodial interrogations and the questioning in the motel room. *See Andaverde*, 64 F.3d at 1312-13 (presence of one officer throughout two interrogations supported conclusion that failure to re-administer warnings did not require suppression, notwithstanding presence of new interrogator at second round of questioning). Nor is it determinative that there was a change of one interrogator in conjunction with the change of location (from the motel to the substation to the jail). *See id.* at 1313 (repeat of warnings not required even though suspect "had been moved into a different room and faced a new interrogator"). It is also significant that Rodriguez-Preciado was in custody continually from the time warnings were first administered through the second day interview. *Cf. Dela Pena*, 72 F.3d at 769 (*Miranda* warnings given before suspect in custody need not be re-administered before custodial interrogation). Thus, there were no intervening events which might have given Rodriguez-Preciado the impression that his rights had changed in a material way. *See id.*

Indeed, Rodriguez-Preciado's own statements indicate that he still understood his rights on the second day of questioning: when Romanaggi asked him whether he remembered being advised of his *Miranda* rights the night before, Rodriguez-Preciado replied that he "thought he had." Contrary to the dissent's suggestion, we do not hold that the "central issue" is "what [Rodriguez-Preciado] remembered concerning the earlier warnings." *Post* at 8726 n.14. We agree that "the issue is whether Rodriguez-Preciado could have reasonably believed that the *Miranda* rights . . . of which he was apprised the night before [were still effective], in light of the changed circumstances." Post at 8713. That Rodriguez-Preciado appeared to remember having received warnings the night before indicates that he did, in fact, understand that his rights had not materially changed notwithstanding the change in circumstances.

At oral argument before us, counsel for Rodriguez-Preciado asserted for the first time that *Missouri v. Seibert*, 124 S. Ct. 2601 (2004) (plurality opinion), should affect our analysis of this issue. We need not decide whether we are bound to follow the plurality opinion in *Seibert* or only that opinion as limited by Justice Kennedy, because *Seibert* did not address the issue raised in this case. *Seibert* dealt with the admissibility of statements made after the police give "midstream" warnings, that is, when police begin a custodial interrogation without advising the suspect of his *Miranda* rights, obtain incriminating statements, and then continue questioning after administering warnings in order to re-elicit the incriminating statements. *See id.* at 2605. The plurality opinion acknowledged that "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility" at trial for statements made by a defendant, *id.* at 2608, but held that "when interrogators question first and warn later," the threshold issue is "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 2610.

In *Seibert*, it was undisputed that the officers had not given the suspect *Miranda* warnings at the outset of the interrogation. *Id.* at 2606. The Court therefore had no occasion to address the question presented here: whether *Miranda* warnings, once given, need to be re-administered due to changed circumstances. Here, Hascall gave *Miranda* warnings in advance of the custodial interrogations, which Rodriguez-Preciado understood and which provided adequate notice given the totality of circumstances. *See, e.g.*, *Dela Pena*, 72 F.3d at 770. The plurality opinion in *Seibert*, which does not cite *Wyrick*, casts no doubt on *Wyrick*'s totality of the circumstances test, or otherwise indicate that our own previous cases have considered or emphasized the wrong factors in applying that test. Thus, *Seibert* is inapposite.

**[8]** We hold that the failure to re-administer warnings on the second day does not automatically render any of the state-

ments made that day inadmissible. We reaffirm the *Wyrick* and our own precedents totality of the circumstances approach, and further emphasize that a district court's factual findings regarding the continued effectiveness of *Miranda* warnings will not be set aside absent clear error. There was none here. We therefore need not decide whether the second day statements taken after Rodriguez-Preciado was re-advised of his *Miranda* warnings are also admissible on the basis of those warnings.

C.

**[9]** The next issue concerns Article 36 of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, which requires law enforcement officials to notify arrested foreign nationals of their right to contact their consulates. Rodriguez-Preciado asks us to hold that the officers' violation of that provision requires exclusion of his statements. However, we have already squarely rejected this argument. *See United States v. Lombera-Camorlinga*, 206 F.3d 882, 885 (9th Cir. 2000) (en banc) ("[A]ssuming that some judicial remedies are available for the violation of Article 36, the exclusion in a criminal prosecution of evidence obtained as the result of post-arrest interrogation is not among them"). We are bound by that decision. *See Montana v. Johnson*, 738 F.2d 1074, 1077 (9th Cir. 1984).

D.

We next address whether any of the evidence seized from Rodriguez-Preciado's person or the van should have been suppressed. We hold that the district court's conclusion that "the production of the cocaine from [Rodriguez-Preciado's] shirt pocket was voluntary" was not error. We also conclude that the district court's finding that Rodriguez-Preciado validly consented to the searches of both his person and the van was not clearly erroneous. The district court found that Rodriguez-Preciado had "no inability to communicate,"

despite his alleged language difficulties. At the time he consented, the officers' guns were not in hand, he had already been informed of his *Miranda* warnings, and no threat had been made that a search warrant could be obtained if he refused consent. The district court's determination that Rodriguez-Preciado knowingly and voluntarily consented to the searches cannot be overturned.

The central issue, then, is whether the searches were within the scope of his consent, an issue that we review for clear error. *See United States v. Huffhines*, 967 F.2d 314, 319 (9th Cir. 1992). Rodriguez-Preciado does not argue that the search of his wallet was outside the scope of his consent, but does make such a claim with respect to the searches of the van.

[10] " 'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?' " *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994), *quoting Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The first search of the van, in which $3,360 was discovered in a child seat, was valid. Because Rodriguez-Preciado "placed no explicit limit on the scope of that search," and the child seat "reasonably could contain contraband," the officers' search of the seat was not outside the scope of consent. *United States v. Gutierrez-Mederos*, 965 F.2d 800, 803-04 (9th Cir. 1992).

[11] Likewise, the district court properly refused to suppress the methamphetamine found behind the van's speaker. Although Rodriguez-Preciado did not explicitly give consent to search that particular area, he informed the officers that drugs could be found there and cannot seriously contend that it would have been unreasonable to expect the officers to act on that information, especially in light of his previous unqualified and unrestricted consent to search the van. When an individual gives general consent to search a vehicle, and

thereafter volunteers that evidence may be found in a specific area inside it, he thereby indicates that a search for that evidence would be within the scope of the original consent. *Cf. Cannon*, 29 F.3d at 477 ("Failure to object to the continuation of a vehicle search after giving general consent to search is properly considered as an indication that the search was within the scope of the initial consent" (internal quotation marks omitted)); *United States v. Mines*, 883 F.2d 801, 804-05 (9th Cir. 1989) ("Mines might have withdrawn or limited his consent, even during the search. His failure to do so indicates he consented to the entire search and everything it revealed"). Moreover, under the circumstances, Rodriguez-Preciado's statement that drugs would be found behind the speaker itself constituted implied consent to search that area. *Cf. Rosi*, 27 F.3d at 413-14 (where individual, after impliedly consenting to agents' request to enter condo, "volunteered to an agent that pertinent evidence might be found in a lamp" with the "full expectation that the agents would search it" and "did not object when they proceeded to do so," district court did not clearly err in finding that individual "invited" agents to look in the lamp).

In addition, the search of the van with a drug-sniffing dog was within the scope of Rodriguez-Preciado's consent. *See United States v. Perez*, 37 F.3d 510, 515-16 (9th Cir. 1994). In any event, nothing was found during that search.

**[12]** For the foregoing reasons, Rodriguez-Preciado's motion to suppress was properly denied. We now turn to his remaining claims.

### III.

**[13]** Rodriguez-Preciado argues that one of the continuances granted by the trial court violated section 3161(c)(1) of the Speedy Trial Act. *See* 18 U.S.C. § 3161(c)(1). Rodriguez-Preciado waived his Speedy Trial Act claim by failing to move for dismissal before trial. *See* 18 U.S.C. § 3162(a)(2)

("Failure of the defendant to move for dismissal prior to trial . . . shall constitute a waiver of the right to dismissal"); *United States v. Brickey*, 289 F.3d 1144, 1150 (9th Cir. 2002). Although Rodriguez-Preciado contends that his lawyer's failure to file a motion to dismiss should not be attributed to him, he does not assert that his lawyer provided constitutionally ineffective assistance or offer any other reason why he should be excused from the statutory consequences of his lawyer's decision. His Speedy Trial Act claim was therefore waived.

## IV.

Finally, we address Rodriguez-Preciado's claim that the prosecutor improperly commented on his decision not to testify. "Claims that a prosecutor committed misconduct during summation are reviewed for plain error, when as here, trial counsel did not object." *United States v. Tam*, 240 F.3d 797, 804 (9th Cir. 2001). In his closing argument, defense counsel stated:

> Now, an example of how they hold back information and don't want you to really know what's going on is when Sara Abbott testifies about the fact that, well, she wouldn't socialize with [Rodriguez-Preciado], but yet I believe she is the one who testified that, well, yeah, I would go get a tattoo, that sort of thing.

Then, in the government's rebuttal argument, the prosecutor quoted defense counsel's argument and stated:

> So when counsel says, "What's going on here," the Government agrees with him. But the defendant has not addressed what's really going on here.
>
> He never did give you an explanation for what's really going on here in the trip receipts.

Rodriguez-Preciado seizes on the reference to "the defendant," and argues that the prosecutor's statement violated the rule prohibiting prosecutorial commentary on a defendant's failure to testify. *See Griffin*, 380 U.S. at 615. "A prosecutor's comment is impermissible if it is 'manifestly intended to call attention to the defendant's failure to testify or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" *Beardslee v. Woodford*, 358 F.3d 560, 586 (9th Cir. 2004), *quoting United States v. Tarazon*, 989 F.2d 1045, 1051-52 (9th Cir. 1993).

**[14]** However, "we have held that a 'comment on the failure of the *defense* as opposed to the *defendant* to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege.'" *United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991), *quoting Castillo*, 866 F.2d at 1083. *See also Tam*, 240 F.3d at 805 ("[W]hen the government refers to 'defendant's arguments' but obviously is addressing the arguments made by defense counsel, there is no *Griffin* violation"). Taking the prosecutor's remarks in context, they were a response to defense counsel's closing argument, not a comment that was "manifestly intended to call attention to [Rodriguez-Preciado's] failure to testify." *Beardslee*, 358 F.3d at 586. Instead, the prosecutor's statements emphasized that the defense had never rebutted the inference raised by the trip receipts introduced by the prosecution to demonstrate that Rodriguez-Preciado had previously traveled to the area to meet with his co-conspirators. Indeed, Rodriguez-Preciado's brief explains that the prosecutor was "[r]esponding to [defense] counsel's rhetorical questions about what the evidence meant." "This argument was directed at the defense, and did not constitute an infringement on [Rodriguez-Preciado's] Fifth Amendment rights." *United States v. Wasserteil*, 641 F.2d 704, 710 (9th Cir. 1981). There was no plain error.

V.

We now address the impact of the recent en banc decision in *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc) on this case. Because we cannot "reliably determine from the record whether the sentence imposed would have been materially different had the district court known that the Guidelines were advisory, we will remand to the sentencing court to answer that question." *Id.* at 1084. The mandate shall issue forthwith.

**AFFIRMED IN PART, REMANDED IN PART.**

---

BERZON, Circuit Judge, dissenting in part:

With the exception of subsection II.B.3, I agree with the majority's opinion in its entirety. I cannot agree, however, with the majority's conclusion that the *Miranda* warning administered to Rodriguez-Preciado on the night of June 26 was still effective the following afternoon.[1] By the time of the interrogation in question, Rodriguez-Preciado had been

---

[1] I also disagree with the majority's assertion that the district court's determination on this point was a "factual finding" warranting clear error review. There is no case law in this circuit concerning the appropriate standard of review for the district court's determination of the continuing "effectiveness" of *Miranda* warnings. The voluntariness of a confession, by contrast, another area of *Miranda* law where we look to the totality of the circumstances, is an issue that we have reviewed de novo since the Supreme Court's decision in *Miller v. Fenton*, 474 U.S. 104, 112-18 (1985). *See, e.g.*, *Tolbert v. Page*, 182 F.3d 677, 682 n.8 (9th Cir. 1999) (en banc). To the extent that the majority suggests only that purely factual findings, such as what the defendant said, are reviewed for clear error, I do not disagree. But *United States v. Andaverde*, 64 F.3d 1305 (9th Cir. 1995), the case on which the majority principally relies for its conclusion that the original warning remained effective in this case, treated that issue as a question of voluntariness and reviewed it de novo. *See id.* at 1310. I would do the same.

moved twice since first being advised of his rights, and was then incarcerated at the local county jail. The combination of the lapse in time and the change in custodial circumstances is sufficient that a suspect could well question whether the same rights still obtained.

I therefore believe that we must address the midstream *Miranda* warning given to Rodriguez-Preciado during his interrogation on June 27. The propriety of those warnings — and of the interrogation elicited thereafter — turns on what rule, if any, the fractured Supreme Court handed down in *Missouri v. Seibert*, 124 S. Ct. 2601 (2004). As I explain below, because I would follow the reasoning of the *Seibert* plurality, I would hold that the district court erred in not suppressing the statements Rodriguez-Preciado made on June 27 and the evidence discovered as a result of those statements.

The district court's error in this regard may well have been harmless beyond a reasonable doubt. The government, however, has not pressed that position here. At least one previous panel of this circuit has suggested, albeit in passing, that the failure to raise harmless error constitutes waiver. *See United States v. Vallejo*, 237 F.3d 1008, 1026 (9th Cir. 2001). Though some of our sister circuits have recognized limited circumstances in which harmless error may be considered sua sponte, *see, e.g.*, *United States v. Rodriguez Cortes*, 949 F.2d 532, 542-43 (1st Cir. 1991). I do not believe that this is such a case, for reasons I elaborate upon below. I would therefore reverse Rodriguez-Preciado's conviction and remand for a new trial.

## I.

As the majority recognizes, "[t]he courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995); *see also United States v. Ross*, 123 F.3d 1181, 1188

(9th Cir. 1997) ("The caselaw does not delineate how long *Miranda* warnings protect a defendant or at what point that protection evaporates."). Instead, we are charged with looking at the totality of the circumstances in each individual case. *See Wyrick v. Fields*, 459 U.S. 42, 48-49 (1982) (per curiam).

In framing our totality-of-the-circumstances inquiry, the operative question is whether a reasonable defendant in Rodriguez-Preciado's position would consider that the *Miranda* warning given to him the night before at the Satellite Motel still applied to anything he said the following day, after he had been booked and lodged at the county jail. In this case, the majority and I agree that the issue is whether Rodriguez-Preciado could have reasonably believed that the *Miranda* rights — including the right to remain silent and to consult with counsel — of which he was apprised the night before did not still obtain on June 27, in light of the changed circumstances. We disagree, however, over the controlling import of Rodriguez-Preciado's statement that he "thought he had" received the *Miranda* warnings the night before. The majority holds that Rodriguez-Preciado's statement "indicates that he did, in fact, understand that his rights had not materially changed notwithstanding the change in circumstances." *Ante* at 8704. In contrast, I believe that the statement says nothing about whether Rodriguez-Preciado understood the earlier warnings to apply to the current circumstances. And, in my view, the totality of the other circumstances weigh in favor of the conclusion that the police *should* have re-advised Rodriguez-Preciado before beginning questioning on June 27.

The majority relies heavily on our decision in *Andaverde*, where we held that a one-day time gap was not enough, *on its own*, to vitiate the continuing effectiveness of the first *Miranda* warning, *see* 64 F.3d at 1313, and on *Guam v. Dela Pena*, 72 F.3d 767 (9th Cir. 1995), in which we held that a fifteen-hour interval between a *Miranda* warning and a custodial interrogation was acceptable, *id.* at 769-70.[2] In *Dela*

---

[2]Also of relevance is our earlier decision in *United States v. Nordling*, 804 F.2d 1466 (9th Cir. 1986), where the court found no requirement that

*Pena*, however, the court emphasized that the relevant time difference was not the fifteen hours that elapsed between the *Miranda* warning and the interrogation, but the far shorter time period that elapsed between the *end* of the first, non-custodial interview (at the beginning of which the *Miranda* warning had been given) and the custodial interrogation. *See id.* at 769. Moreover, neither precedent involved other changed circumstances to the degree presented here.

In *Dela Pena*, the central issue before the court was whether *Miranda* warnings given to a suspect before he was "in custody" needed to be repeated once the police began a custodial interrogation. Two facts were central to the court's decision that they did not: First, the police reminded Dela Pena of his waiver of his *Miranda* rights before the custodial interrogation began. *See id.* The court held that "it was not necessary to *repeat* the earlier *Miranda* warnings," *id.* at 769 n.1 (emphasis added), yet it stressed several times the extent to which the officers *reminded* Dela Pena of his earlier waiver. *See, e.g., id.* at 770.

Second, the lapse of time was the *only* significant changed circumstance. Although Dela Pena was not in custody at the time he was first given his *Miranda* warnings, he *was* in the police station, the same place where the custodial interrogation eventually took place. *Id.* at 770 ("Other than this passage of time, Dela Pena points to nothing to suggest the effectiveness of the earlier *Miranda* warnings was diminished."). The same interrogator questioned him in the same room, and, though fifteen hours elapsed from the initial provision of the

a suspect be readvised of his *Miranda* rights when the interrogation was continued by different questioners and "[n]o appreciable time had elapsed." *Id.* at 1471. The *Nordling* court did not explicitly state what it meant by "no appreciable time," though it cited, with approval, an Eighth Circuit case holding that a five-hour gap between interviews did not require re-administration of the warnings. *See id.* (citing *Stumes v. Solem*, 752 F.2d 317 (8th Cir. 1985)).

*Miranda* warnings to the beginning of the custodial interrogation, only six-and-a-half hours elapsed between the two interviews. *See id.* at 769 (noting that questioning ended at 4:00 a.m., and recommenced at 10:35 that same morning). Here, roughly fourteen hours elapsed between the end of the first interrogation and the beginning of the second.[3]

Similarly, in *Andaverde*, the defendant was first questioned by a police officer, who properly Mirandized him. Shortly thereafter, he was questioned by a probation officer, who did not re-advise Andaverde of his *Miranda* rights. The same probation officer interviewed Andaverde again the following day, and, though the opinion is not lucid on this point, it appears that both interviews took place in the same location.[4] Relying — somewhat erroneously — on *Jarrell v. Balkcom*, 735 F.2d 1242, 1254 (11th Cir. 1984),[5] the court held that the probation officer was not required to re-advise Andaverde of his *Miranda* rights initially, since "the two interrogations were an uninterrupted sequence of events," *Andaverde*, 64 F.3d at 1312, and that the one-day[6] interval, standing alone, was

---

[3]Though the record in this case is not explicit, it appears that the *Miranda* warning was administered to Rodriguez-Preciado at the Satellite Motel shortly after 9:00 p.m. on June 26, and that the interrogation on June 27 began shortly after 1:15 p.m. The interrogation at the county jail conducted on the night of June 26 appears to have concluded by 11:30 p.m.

[4]The court in *Andaverde* noted that "[t]he next day, October 28, Keeth *again* questioned Andaverde at the jail." 64 F.3d at 1308 (emphasis added). Earlier in the opinion, the court suggests that the original questioning happened at the police station. *See id.* But the court's use of the word "again," without noting any other change in circumstances, seems to indicate that the two interviews were both conducted in the same general place.

[5]The *Andaverde* court miscited *Jarrell* as a Ninth Circuit decision. *See* 64 F.3d at 1312.

[6]The facts in *Andaverde* are unclear concerning *when* the interrogations took place on each day. Therefore, though the majority here reads *Andaverde* as approving a "one day" delay, *see ante* at 8703, and though *Andaverde* itself spoke of a period of "one day," *see* 64 F.3d at 1313, it is entirely possible that the actual delay between the end of the second interrogation and the beginning of the third was closer to twelve hours, *see id.* at 1308 & n.2, less than the interval in this case.

insufficient to render the original warning ineffective, *id*. at 1313.

In *Andaverde*, then, as in *Dela Pena*, the only material consideration detracting from the continued effectiveness of the *Miranda* warnings was the time between the interviews. Even at their broadest, *Andaverde* and *Dela Pena*, taken together, thus hold that an interval of up to one day between questioning does not *necessarily* require officers to re-advise suspects of their *Miranda* rights. At the same time, neither *Andaverde* nor *Dela Pena* embraces the opposite holding — that an interval of up to one day *necessarily* validates a later interview, regardless of other circumstances.

By contrast, at least two district courts have suggested that re-administration of *Miranda* would have been necessary in a case presenting facts analogous to those here. Of perhaps most interest is the Middle District of Pennsylvania's decision in *United States v. Vasquez*, 889 F. Supp. 171 (M.D. Pa. 1995), in which the court applied a five-factor test to determine whether a statement made after a significant delay since *Miranda* warnings were given should be admissible. Borrowing from the Pennsylvania Supreme Court's decision in *Commonwealth v. Hughes*, 555 A.2d 1264 (Pa. 1989), *Vasquez* spelled out five considerations:

> "(1) the time lapse between the last *Miranda* warnings and the appellant's statement; (2) interruptions in the continuity of the interrogation; (3) whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the appellant's statement was made; (4) whether the same officer who gave the warnings also conducted the interrogation resulting in the appellant's statement; and (5) whether the statement elicited during the complained-of interrogation differed significantly from other statements which had been preceded by *Miranda* warnings."

*Vasquez*, 889 F. Supp. at 177 (quoting *Hughes*, 555 A.2d at 1276); *see also id.* at 178 ("[W]e believe [this list] provides an excellent barometer against which to at least begin the review of the circumstances in a particular case.").[7]

A host of district courts have since relied on the *Vasquez* factors. In particular, the Eastern District of Michigan applied *Vasquez* to a case factually similar to this one, concluding in *United States v. Jones*, 147 F. Supp. 2d 752 (E.D. Mich. 2001), that statements from a subsequent interrogation eighteen hours after the *Miranda* warnings, by a different law enforcement officer, and in a different place, should not be admissible:

> More than eighteen hours had passed . . . between the *Miranda* warnings that Sgt. Payer gave Defendant on February 14 and Defendant's interview with Agent Kendall on February 15. During that period, there was an interruption in the continuity of the interrogation, as Sgt. Payer had ceased his questioning at 1:13 a.m. on February 15 and Agent Kendall did not begin his interview earlier than 6:00 p.m. There was a change in location between the interview that Sgt. Payer conducted and the interrogation done by Agent Kendall. The former was at the police station; the latter was at the federal building. Agent Kendall, who conducted the interview of Defendant on February 15, was not the same officer who administered the warnings on February 14. All of these factors militate toward the conclusion that

---

[7]The *Vasquez* court concluded that the five factors weighed in favor of admitting Vasquez's statements. Its determination turned on the short time delay, the fact that Vasquez knew he was going to be interviewed by different officers, and Vasquez's "long experience and frequent contact with the criminal justice system." 889 F. Supp. at 178. At most, only one of the five factors weighed in Vasquez's favor, and the court found that factor — the interview by different officers — negligible given Vasquez's prior knowledge that such a change was to occur.

Defendant could not fully appreciate a waiver of his *Miranda* rights when he spoke to Agent Kendall on February 15 and that his statements to Agent Kendall must therefore be suppressed. The Court apprehends no factors militating toward the opposite conclusion.

*Jones*, 147 F. Supp. 2d at 761-62 (citations omitted).

What is notable about *Vasquez* and *Jones* is that in both cases, the court looked at the various factors from the perspective of the *suspect*, centering on whether he could reasonably believe that the first warning did not still have force — that is, on whether the original warning was still fully effective. As discussed in more detail below, this is the core principle enunciated, albeit in a different context, by the Supreme Court plurality in *Seibert*. Interpreting this case through the reasonableness lens, and applying the *Vasquez* factors, I conclude that a suspect could reasonably believe that the rights of which he was earlier advised no longer obtained.

First, fourteen hours passed between the end of the second June 26 interview by Officer Hascall and the beginning of Rodriguez-Preciado's June 27 interview by Sergeant Romanaggi. During this period, there was a significant interruption in the interrogation, as Officer Hascall had concluded his two separate interrogations of Rodriguez-Preciado the night before. There was a change in location,[8] as the June 27 interview was conducted at the county jail, where Rodriguez-Preciado had been booked and lodged the night before. And the interrogating officer, Sergeant Romanaggi, was not the officer who had provided *Miranda* warnings the night before, nor was he in the motel room when the warnings were given.

On these facts alone, *Vasquez* and *Jones* suggest that the

---

[8]In point of fact, there had been *two* changes in location since the warnings were first administered — from the Satellite Motel to the police substation, and from the substation to the jail.

*Miranda* warning given to Rodriguez-Preciado at the Satellite Motel on the night of June 26 was no longer effective on the afternoon of June 27. Add to this Rodriguez-Preciado's fundamental change in status, from a suspect arrested in his own motel room to an incarcerated defendant taken from his cell in a county jail for interrogation, and the case for suppressing his June 27 statements is all the stronger.

Once a suspect is subjected to pretrial detention — as opposed, for example, to arrested but released while awaiting trial — he is obligated to follow the directions and orders he is given, declining to do so at his peril. *See Bell v. Wolfish*, 441 U.S. 520, 537-40 (1979). Under those circumstances, a suspect in Rodriguez-Preciado's position could reasonably doubt the efficacy of the original warning, positing that the same rules might not apply after being booked and incarcerated as applied before he became, in effect, a prisoner. While an individual learned in the law would know otherwise, *Miranda* warnings assume that the suspect is a tabula rasa, lacking knowledge of his or her legal rights. To that end, *Miranda* provides prophylactic warnings so as to avoid the need for later inquiry into subjective voluntariness. That being the case, it is inconsistent with the preventative nature of the *Miranda* requirement to assume that a suspect is aware of the diverse circumstances in which the rights covered by *Miranda* warnings obtain.

I conclude that, taking all of the pertinent factors together, as *Wyrick* instructs, a reasonable person receiving the *Miranda* warning issued by Officer Hascall on the night of June 26 in the motel room would not necessarily assume that the same ground rules applied regarding interrogation conducted the next day, under quite different custodial circumstances and by different interrogators. I would therefore hold that all statements made during the June 27 interrogation *before* Romanaggi re-advised Rodriguez-Preciado of his *Miranda* rights should have been suppressed.

## II.

The question remains whether the statements made *after* Romanaggi delivered the *Miranda* warning are admissible. Their admissibility is an open question in this circuit.

We are no longer bound by *United States v. Orso*, 266 F.3d 1030 (9th Cir. 2001) (en banc), as the Supreme Court explicitly overruled that decision in *Missouri v. Seibert*, 124 S. Ct. at 2607,[9] last Term. *Seibert* did not, however, create a per se rule barring the admissibility of all statements taken subsequent to mid-interrogation *Miranda* warnings.

Instead, a plurality of the Court carved out an objective exception to *Oregon v. Elstad*, 470 U.S. 298 (1985), which had held that statements taken subsequent to midstream *Miranda* warnings should only be suppressed if they were not knowingly or voluntarily made. *Id.* at 309. For the *Seibert* plurality, the admissibility of statements taken post-*Miranda* in such a case turns on whether a midstream warning was effective under the circumstances.

As Justice Souter wrote for the four-member plurality,

> The threshold issue when interrogators question first and warn later is . . . whether it would be *reasonable* to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably

---

[9]The Court granted certiorari in *Seibert* to resolve a circuit split between *Orso* and a similar holding by the First Circuit, on the one hand, and the Eighth and D.C. Circuit decisions in conflict with *Orso*, on the other. *See Seibert*, 124 S. Ct. at 2607 (plurality opinion) (citing *United States v. Gale*, 952 F.2d 1412, 1418 (D.C. Cir. 1992); *United States v. Carter*, 884 F.2d 368, 373 (8th Cir. 1989); *Orso*, 266 F.3d at 1034-39; and *United States v. Esquilin*, 208 F.3d 315, 319-21 (1st Cir. 2000)).

convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Seibert*, 124 S. Ct. at 2610 (plurality opinion) (emphasis added); *see also id*. at 2611 ("When [*Miranda*] warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.' " (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986))). Whether statements given after midstream *Miranda* warnings should be admissible, the plurality concluded, turned entirely on "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object." *Id.* at 2612. Effectiveness, the plurality suggested, was a question of what the *suspect* reasonably believed. Depending on the circumstances, midstream warnings can "be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id*. at 2613.

Concurring in the judgment, however, Justice Kennedy concluded that such a reasonableness test, which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations. . . . cuts too broadly." *Id*. at 2615-16 (Kennedy, J., concurring in the judgment). Justice Kennedy believed that *Elstad* should govern absent a showing that the law enforcement officers deliberately attempted an end-run around *Miranda*, as in *Seibert*. *See id*.

That no opinion in *Seibert* commanded the agreement of a majority of the Justices creates a difficulty in determining which rule to apply here. Generally, where there is no majority opinion, the narrowest opinion adhered to by at least five Justices controls. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *see also Townsend v. Quasim*, 328 F.3d 511, 519 n.3 (9th Cir. 2003) (citing *Smith v. Univ. of Wash., Law Sch.*, 233 F.3d 1188, 1199 (9th Cir. 2000)). Applying the *Marks* rule to *Seibert*, however, is not a straightforward endeavor.

Justice Kennedy concurred in *Seibert* on a ground arguably narrower[10] than that relied upon by the plurality. He stated that deliberateness on the part of the police — or the lack thereof — should guide the inquiry, not the objective effectiveness factors outlined in Justice Souter's plurality opinion.[11] But three of the four Justices in the plurality *and* the four dissenters decisively rejected any subjective good faith consideration, based on deliberateness on the part of the police.[12] In

---

[10]Justice Kennedy characterized his opinion as "narrower." *See Seibert*, 124 S. Ct. at 2616 (Kennedy, J., concurring in the judgment).

[11]Leaving aside its substantive analysis, Justice Kennedy's opinion created a clear fifth vote for overruling our en banc decision in *Orso*, in which we had held that a confession after a midstream *Miranda* warning should be suppressed only if the pre-warning confession was "involuntary, and any taint therefrom had not dissipated by the time [the defendant] was read the *Miranda* warnings." 266 F.3d at 1039. This position, echoed in Justice O'Connor's dissent in *Seibert*, is at odds with Justice Kennedy's conclusion that, subject to deliberateness on the part of the police, "postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." 124 S. Ct. at 2615 (Kennedy, J., concurring in the judgment). Because Justice Kennedy agreed that the *Elstad*-based voluntariness approach that *Orso* approved could not stand, there can be no question as to whether *Orso* remains the law of the circuit. The operative issue is *why* it does not.

[12]Arguably, Justice Breyer's concurring opinion, though he fully concurred in (and joined) Justice Souter's opinion for the plurality, differs from the plurality on the deliberateness point. *See, e.g.*, *Seibert*, 124 S. Ct. at 2614 (Breyer, J., concurring) (joining Justice Kennedy's opinion "insofar as it . . . makes clear that a good-faith exception applies"). Accepting this position for the sake of argument, the tally is seven to two against the subjective-intent-of-the-interrogator position.

dissent, Justice O'Connor, joined by the Chief Justice and Justices Scalia and Thomas, repeatedly agreed with the plurality that the subjective intent of the interrogator cannot control. *See, e.g.*, *Seibert*, 124 S. Ct. at 2616 (O'Connor, J., dissenting) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer."); *id.* at 2617 ("The plurality's rejection of an intent-based test is also, in my view, correct."); *id.* ("Because voluntariness is a matter of the suspect's state of mind, we focus our analysis on the way in which suspects experience interrogation. . . . Thoughts kept inside a police officer's head cannot affect that experience."); *id.* at 2618 ("[R]ecognizing an exception to *Elstad* for intentional violations would require focusing constitutional analysis on a police officer's subjective intent, an unattractive proposition that we all but uniformly avoid."). Most definitive is Justice O'Connor's statement at the end of Part I of her dissent: "[T]he approach espoused by Justice KENNEDY is ill advised. . . . This approach untethers the analysis from facts knowable to, and therefore having any potential directly to affect, the suspect." *Id.* at 2618-19.

The dissenters went on to disagree with the plurality over the force of *Elstad*: The plurality, along with Justice Kennedy, favored creating an exception to *Elstad*, although the opinions differed fundamentally as to the nature of the exception. The dissent, in contrast, took issue with the extent to which the plurality "devour[ed]" *Elstad*. *Id.* at 2616. Under *Elstad*, the dissent suggested, "if [the defendant's] first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances . . . ." *Id.* at 2619. In so maintaining, however, the dissent also necessarily disagreed with the plurality that the relevant standard should be the objective effectiveness of the warnings. Instead, Justice O'Connor suggested that question-first interrogations should be analyzed "under the voluntariness standards central to the Fifth Amendment and reiterated in *Elstad*." *Id.*

This analysis of the *Seibert* opinions indicates that while Justice Kennedy's was the crucial fifth vote for the result, and for the proposition that *Elstad* does not strictly govern cases with midstream *Miranda* warnings, Justice Kennedy's opinion is *not* the narrowest opinion embodying a position supported by at least five Justices in the majority. It embodies a position supported by two Justices, at most.

The *Marks* rule is not helpful under these circumstances. As several circuits have convincingly explained, "the *Marks* rule is applicable only where 'one opinion can be meaningfully regarded as "narrower" than another' " *and* "can 'represent a common denominator of the Court's reasoning.' " *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 170 (3d Cir. 1999) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)); *see also United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003); *A.T. Massey Coal Co., Inc. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002). The D.C. Circuit further explained this point in *King v. Palmer*:

> *Marks* is workable — one opinion can meaningfully be regarded as "narrower" than another — only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must present a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment . . . . When . . . one opinion supporting the judgment does not fit entirely within a broader circle drawn by the others, *Marks* is problematic. If applied in situations where the various opinions supporting the judgment are mutually exclusive, *Marks* will turn a single opinion that lacks majority support into national law.

950 F.2d at 781-82.

"In such a case," the Third Circuit has suggested, "the only binding aspect of a splintered decision is its specific result." *Anker Energy*, 177 F.3d at 170. *Seibert*, however, is *not* a splintered decision in which "a fragmented Court [has] decide[d] a case and no single rationale explaining the result enjoys the assent of five Justices." *Marks*, 430 U.S. at 193. Broken into separate holdings, all but one of the central points of *Seibert* enjoys the support of five Justices: The rejection of subjective intent enjoys the assent of at least seven Justices. The overruling of *Orso* enjoys the support of five Justices. The existence of exceptions to *Elstad* enjoys the support of five Justices. The only point not enjoying the assent of five Justices is the appropriate admissibility standard to apply, on which the Court is split 4-1-4.

As I read it, in agreement with the other circuits' opinions discussed above, *Marks* does not prescribe the adoption as governing precedent of a position squarely rejected by seven Justices.[13] Justice Kennedy's opinion on the admissibility standard therefore cannot govern.

If Justice Kennedy's opinion does not govern, then what does? There are three possibilities: The dissent controls; the plurality controls; or there is no controlling position, and we are free to start from scratch — with *Orso* no longer binding precedent.

The *Seibert* dissent cannot govern because the holding that *Elstad* does not control in a case like this one *received five votes*. The dissent's position in *Seibert* is therefore irreconcil-

---

[13]A rule that *Marks* does not apply to cases where the result of applying it is indiscernible or illogical finds contemporary support in a brief passage of Justice O'Connor's opinion in *Grutter v. Bollinger*, 539 U.S. 306 (2003). Commenting on whether Justice Powell's solo opinion in *Bakke* controlled, the *Grutter* Court concluded that "it does not seem 'useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it.' " *Id*. at 325 (quoting *Nichols v. United States*, 511 U.S. 738, 745-46 (1994)).

able with the conclusion of the majority of the Court. The plurality opinion is not binding precedent either, at least as to the admissibility standard, for no fifth vote supporting its rationale is to be found. Instead, I suggest that *Seibert* leaves this court in a situation where there is no binding Supreme Court or Ninth Circuit precedent as to the governing standard.

Nothing bars this court, however, from adopting the *Seibert* plurality's standard as the law of the circuit. *See United States v. Hearst*, 563 F.2d 1331, 1345 n.10 (9th Cir. 1977) (following as "persuasive" the Supreme Court's plurality opinion in *Lanza v. New York*, 370 U.S. 139 (1962)). Various of our sister circuits have also adopted the decisions of Supreme Court pluralities as the law of the circuit. *See, e.g.*, *Kirsch v. Plovidba*, 971 F.2d 1026, 1028-29 (3d Cir. 1992) (adopting a three-Justice plurality in *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156 (1981), as the law of the circuit); *accord Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 536 n.4 (3d Cir. 1994) (recognizing *Kirsch* as so holding). Absent any governing law to the contrary, I would follow a similar path here and adopt the rule advocated by the *Seibert* plurality as the law of this circuit.

Applying the *Seibert* plurality's standard, the admissibility of statements given subsequent to midstream *Miranda* warnings turns on whether "a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, [and] the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." 124 S. Ct. at 2612 (plurality opinion).[14] The factors the plurality identified as rele-

---

[14]Adopting this standard would also reduce the complexity of the first issue considered in this opinion — whether the original *Miranda* warnings were still effective at the outset of the June 27 interview. As the *Seibert* plurality/dissent emphasizes, the central issue is what the *suspect* could reasonably have believed, based on the totality of circumstances, regarding the continued effectiveness of the earlier warnings — not, as the majority would have it here, what he remembered concerning the earlier warnings.

vant to this inquiry are "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id*.

In cases such as this one, where the warning was delivered in the midst of the same interrogation in the same place by the same officer, and where the officer goes *back over* the very same questions he asked before re-advising the suspect of his *Miranda* rights, the *Seibert* plurality approach results in exclusion of the statements taken after the midstream warning. I would so hold.

### III.

It is possible, however, that the district court's error in not suppressing Rodriguez-Preciado's June 27 statements is harmless beyond a reasonable doubt. The error is certainly harmless as it pertains to Rodriguez-Preciado's *sentence*, since the sentence was calculated based on drug quantity levels that, even without his June 27 statements, would still have resulted in the same base offense level under section 2D1.1(c)(2) of the U.S. Sentencing Guidelines.[15]

---

[15]Rodriguez-Preciado confessed to being in possession of — and distributing — various drug quantities, including at least six pounds of methamphetamine (five or six to Glenn and one to Jim Grenfell), a half-kilo of cocaine (to Grenfell), a quarter-pound of cocaine (in another instance), and nineteen to twenty-three pounds of marijuana. The police were able independently to tie various other drug quantities to Rodriguez-Preciado, but as the Presentence Report (PSR) makes clear, at least thirty-five pounds of marijuana, thirteen and one-quarter pounds of methamphetamine, and five kilograms of cocaine were attributed to Rodriguez-Preciado based solely on the statements he made to the police, nearly all of which came on June 27.

Because these statements should have been suppressed, the quantities should not have figured into Rodriguez-Preciado's sentence. As the PSR

The government never suggested, however, in its briefs or at argument, that such error was harmless as to either the sentence or the underlying conviction. Whether we can review for harmless error sua sponte is, perhaps surprisingly, a question that the Ninth Circuit has never directly considered, though most circuits to reach this question have answered it in the affirmative, subject to considerations including "the length and complexity of the record, whether the harmlessness of the error or errors found is certain or debatable, and whether reversal will result in protracted, costly, and ultimately futile proceedings in the district court." *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991).[16] The only Ninth Circuit case even remotely on point, *United States v.*

identifies, the drug quantities based entirely on Rodriguez-Preciado's statements add up to a total of 7,025 kilograms of marijuana. Rodriguez-Preciado's *total* sentence was based on a total drug quantity of 22,739 kilograms of marijuana. Therefore, absent the drug quantities that were attributed to him based on his June 27 statements, Rodriguez-Preciado's sentence should have been based on a total quantity of 15,714 kilograms of marijuana. But this quantity nets the exact same base offense level — 36 — under U.S.S.G. § 2D1.1(c)(2) as the 22,739 kilograms actually relied upon by the district court. Because recalculation of the quantity based on the admissible evidence would not lead to a lesser base offense level, the district court's error in not suppressing Rodriguez-Preciado's June 27 statements, as it pertains to sentencing, was objectively harmless. *See United States v. Alvarez*, 358 F.3d 1194, 1213 (9th Cir. 2004); *see also United States v. Scheele*, 231 F.3d 492, 499-500 & n.4 (9th Cir. 2000).

[16]Though none of the *Giovannetti* line of cases cite to them, the mandatory language contained in the corresponding provisions of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Judicial Code, supports the notion that harmless error may be reviewed sua sponte. *Compare* FED. R. CIV. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."), *and* FED. R. CRIM. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."), *with* 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."). *See generally Chapman v. California*, 386 U.S. 18, 21-24 & n.5 (1967) (discussing the background and purpose of these provisions).

*Vallejo*, tersely held that failure to raise harmless error constitutes waiver, without reaching whether a court could consider the issue sua sponte. *See* 237 F.3d at 1026 ("The Government does not argue that this error was harmless and thus waives that argument.");[17] *see also Calvert v. Wilson*, 288 F.3d 823, 835-37 (6th Cir. 2002) (Cole, J., concurring in the judgment) (citing *Vallejo* and summarizing the extant harmless error/ waiver case law).

As the First Circuit has explained, the approach outlined in *Giovannetti* is sensible because, "[i]n a case of clearly harmless error it would be a waste of judicial resources to require a new trial where the result is likely to be the same. In a complex case, it would be equally wasteful of judicial resources to require the appellate bench to delve independently into a complex record without the aid of the government's brief and the defendant's responses to it." *Rodriguez Cortes*, 949 F.2d at 543. Put another way, the touchstone of whether courts should reach harmless error sua sponte is the extent to which the harmlessness of the error is open to question.

Here, though the harmlessness is clear for Rodriguez-Preciado's sentence, I believe that is unclear as to his conviction, particularly for the third count of the indictment, conspiracy to possess with intent to distribute. A substantial amount of the evidence introduced at trial concerning the existence of a conspiracy — and Rodriguez-Preciado's role therein — came from Sergeant Romanaggi's testimony concerning his June 27 interrogation of Rodriguez-Preciado. It is entirely possible that the jury would still have found Rodriguez-Preciado guilty without that evidence. The salient point, however, is that the harmlessness of Romanaggi's testimony with respect to the conspiracy charge is at the very least "debatable." That is enough, under the *Giovannetti* line of cases, to bar sua sponte harmless error review.

---

[17]In *Vallejo*, the court concluded that the error was not harmless in any event. *See* 237 F.3d at 1026.

\* \* \*

Because I would not reach whether the district court's refusal to suppress Rodriguez-Preciado's June 27 statements constitutes harmless error as to his conviction, I would reverse and remand for a new trial. I therefore respectfully dissent from subsection II.B.3 of the majority's opinion, and, because of the above harmless error discussion, from the result its analysis necessarily compels.