**UNITED STATES of America**

v.

**Virgilio Soto VASQUEZ a/k/a "Chico," Defendant.**

**No. 4:CR–94–0210.**

United States District Court, M.D. Pennsylvania.

June 13, 1995.

Eric Pfisterer, Asst. U.S. Atty., Harrisburg, PA, for U.S.

Jeffrey C. Dohrmann, Williamsport, PA, for defendant.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On September 15, 1994, a grand jury sitting in the Middle District of Pennsylvania returned a two-count indictment charging defendant Virgilio Soto Vasquez with first-degree murder and possession of a prohibited object. The indictment relates to a stabbing

incident at the United States Penitentiary at Lewisburg, Union County, Pennsylvania, on March 19, 1991. A jury was selected June 5, 1995, and the case currently is being presented to the jury.

Before the court is a motion by Vasquez to exclude the testimony of Special Agent Carlyle R. Thompson of the Federal Bureau of Investigation related to a statement given by Vasquez on the day of the stabbing.

## DISCUSSION:

### I. STANDARD OF REVIEW

It is by now axiomatic that a defendant is entitled to be informed of certain, fundamental rights prior to custodial interrogation by law enforcement officials. These rights include the right to remain silent, that anything said can and will be used in court, that the defendant has the right to have a lawyer present during questioning, and that a lawyer will be appointed by the court if the defendant cannot afford one. *Miranda v. Arizona,* 384 U.S. 436, 467–473, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966). These rights must be voluntarily, knowingly and intelligently waived prior to further questioning, with the burden on the government to demonstrate a valid waiver. 384 U.S. at 475, 86 S.Ct. at 1628.

With these principles in mind, we turn to the events in question.

### II. FINDINGS OF FACT

1. On March 19, 1991, Abraham Reyes, then an inmate at USP–Lewisburg, was stabbed during the evening meal, while seated at a table in the penitentiary dining facility.

2. The stabbing occurred between 5:15 and 5:30 p.m., and Reyes died as a result of his wounds.

3. Immediately following the stabbing, Corrections Officer Kenneth A. Long went to the area, reacting to the ensuing commotion among the inmates.

4. Upon arriving at the scene, C.O. Long used his portable radio to call for assistance from other officers.

5. C.O. Long also noticed the defendant, Virgilio Soto Vasquez, acting in what he considered to be a suspicious manner.

6. Based upon his observation, C.O. Long directed another officer to take Vasquez into custody.

7. Vasquez was taken into custody initially by Lieutenant Stephen Dollar, who placed handcuffs on Vasquez and escorted him from the dining facility.

8. Vasquez was taken into a common area near the front of the prison known as the "Red Top," where custody of Vasquez was turned over to Corrections Officer Steven W. Bilger, while Lt. Dollar took custody of a weapon found at the scene of the stabbing.

9. Vasquez was escorted to the Special Housing Unit (SHU) by C.O. Bilger and Corrections Officer Raymond Geiswite.

10. While being escorted from the dining hall, Vasquez tried to make statements to the officers to the effect that another inmate being taken into custody had nothing to do with the stabbing.

11. In response to these statements, Vasquez was told repeatedly by corrections officers that he had the right to remain silent.

12. Staff escorting Vasquez to SHU did not ask questions or otherwise act in a manner designed to elicit these statements.

13. Upon arrival at SHU, C.O. Geiswite read the *Miranda* warnings to Vasquez from a card which he carried regularly in his wallet for such occasions.

14. The warnings read by C.O. Geiswite were substantially the same as those he currently carries, with the exception that the phrase "can and will be used against you ..." now appears as "could be used against you ..."

15. When C.O. Geiswite finished reading Vasquez his *Miranda* rights, he asked if Vasquez understood.

16. Vasquez responded substantially as follows: "Of course, I know my rights."

17. C.O. Geiswite then informed Vasquez that an investigator would arrive later to talk to Vasquez.

18. The time at which the *Miranda* warnings were provided to Vasquez was approximately 5:30 p.m.

19. No further discussion took place between Vasquez and C.O. Geiswite, and the latter left SHU to escort Reyes to the hospital.

20. Following the stabbing, Special Agent Carlyle R. Thompson of the Federal Bureau of Investigation was contacted by staff at USP–Lewisburg concerning the incident.

21. S.A. Thompson's regular duties in March of 1991 did not include investigations at USP–Lewisburg, but no other agent in the district was available.

22. S.A. Thompson travelled to USP–Lewisburg, and was informed that a total of three inmates were being held in SHU as a result of the stabbing.

23. S.A. Thompson interviewed Vasquez, with Special Investigative Agent Nelson Aponte of the BOP also present.

24. Vasquez had asked to see S.I.A. Aponte for the purpose of finding out why he was being held in SHU.

25. S.A. Thompson and S.I.A. Aponte interviewed Vasquez in the Inmate Disciplinary Committee Hearing Room, which is a part of SHU.

26. S.A. Thompson identified himself and S.I.A. Aponte, and informed Vasquez of the purpose of the interview, but did not provide *Miranda* warnings to Vasquez.

27. Vasquez answered questions posed by S.A. Thompson and provided the following information:

(a) At the time of the incident, Vasquez had gone through the food line and was in the process of looking for a place to sit down.

(b) Vasquez was alone in the west side of the dining room, standing by the wall, in an area where the Spanish inmates generally sit.

(c) Reyes was a friend of Vasquez, the two having known each other for two years.

(d) Vasquez did not know where Reyes was sitting.

(e) When the commotion broke out in the Spanish area of the dining room, Vasquez moved to the front of the dish room and sat down at a table.

(f) As to the commotion, Vasquez heard loud noises and yelling, saw everyone get up from their table and stand, but did not see any of the incident.

(g) Vasquez was not aware that Reyes had any problems with other inmates, nor was aware of a motive for the assault.

(h) Vasquez had last seen Reyes around lunch time.

(i) Immediately after the incident, a corrections officer came to Vasquez' table and took him into custody for unknown reasons.

(j) Vasquez did not know the other inmate taken into custody in the dining hall.

28. This statement contradicts the testimony of inmate witnesses called by the defense in several ways, including:

(a) The witnesses testified that Vasquez went to the aid of Reyes, in contrast to Vasquez' statement that he remained seated;

(b) The witnesses' testimony suggests that Vasquez was aware of the incident at the time it occurred or shortly thereafter, in contrast to Vasquez' statement that he did not know why he was taken into custody.

(c) At least one other witness testified that Vasquez was in the food line at the time of the stabbing, in contrast to Vasquez' statement that he had his food and was looking for a seat.

29. The statement by Vasquez is relevant as a false exculpatory statement, as rebuttal for his defense, and as suggesting that the testimony of the defense witnesses (none of whom provided a statement early in the investigation) was created to be consistent with the evidence in the possession of the government (for example, the blood on Vasquez' jacket).

30. As to the latter reason for relevance, the manufacture of the testimony to comport with government evidence would be consistent with the introduction by the government

of a letter which suggests that inmates were communicating to each other the substance of their testimony.

31. The interview of Vasquez by S.A. Thompson and S.I.A. Aponte began at 8:47 p.m., so that approximately three to three-and-one-half hours passed between the reading of the *Miranda* warnings by C.O. Geiswite and the interview.

32. Vasquez' "rap sheet" provided by the government, Exhibit 2 to Government's Memorandum in Support of the Admission of the Defendant's Pre–Trial Statement, indicates that, between March 14, 1973, and July 18, 1984, he was arrested fourteen times on charges including armed robbery, bank robbery, possession of narcotics, unlawful possession of firearms, importing heroin, giving false information to the police, and possession of "dum-dum" bullets.

33. Vasquez' inmate history (a printout of computer records maintained by the BOP), *id.*, Exhibit 1, indicates that Vasquez has been placed in disciplinary segregation or administrative detention at USP–Lewisburg on ten separate occasions.

### III. CONCLUSIONS OF LAW

1. The fact that an inmate is incarcerated does not necessarily indicate that he is in "custody" for purposes of *Miranda.* *United States v. Conley,* 779 F.2d 970 (4th Cir.1985), *cert. denied,* 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986).

2. The hand-cuffing of Vasquez after the incident and his placement in SHU constituted further restraints on his liberty than is customary in USP–Lewisburg, and constituted "custody" for purposes of *Miranda.* *See generally Garcia v. Singletary,* 13 F.3d 1487, 1489–1491 (11th Cir.), *reh'g and reh'g en banc denied,* 22 F.3d 1101 (11th Cir.) (table), *cert. denied, —— U.S. ——,* 115 S.Ct. 276, 130 L.Ed.2d 193 (1994).

3. Based on the questions posed by S.A. Thompson, the interview of Vasquez on March 19, 1991, constituted interrogation for purposes of *Miranda.*

4. *Miranda* warnings must be given prior to custodial interrogation in the prison setting. *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

5. Vasquez was entitled to be given *Miranda* warnings prior to the interview of March 19, 1991.

6. The standard for the sufficiency of *Miranda* warnings and a waiver of the rights enumerated therein is a totality of the circumstances test. *United States v. Velasquez,* 885 F.2d 1076, 1086 (3d Cir.1989), *reh'g denied, cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990).

7. The circumstances reviewed include the background, experience, and conduct of the suspect. *Id.*

8. The passage of time between the issuance of *Miranda* warnings and custodial interrogation does not necessarily render statements responsive to the questioning inadmissible. *See Stumes v. Solem,* 752 F.2d 317, 321 (8th Cir.) (six and one-half hour gap between warnings and second interview did not violate *Miranda* because "[t]o require the police to reissue *Miranda* rights under these circumstances would serve no real purpose."), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985).

9. In the circumstances presented in this case, S.A. Thompson was not required to re-warn Vasquez with respect to his *Miranda* rights, as Vasquez was well aware of his rights.

10. A waiver of the right to remain silent need not be affirmative, but may be found to exist based upon the totality of the circumstances, including the failure to indicate a desire to remain silent in the face of questioning by a police officer following the reading of *Miranda* warnings. *See, e.g., United States v. Cruz,* 910 F.2d 1072, 1080 (3d Cir.1990).

11. Vasquez made a voluntary, knowing, and intelligent waiver of his *Miranda* rights by answering the questions posed during the custodial interrogation of March 19, 1991.

12. The statement made by Vasquez during the custodial interrogation on March 19, 1991, is admissible at trial.

## IV. ANALYSIS

Several courts have examined the question of whether the passage of time before interrogation may dissipate the effect of *Miranda* warnings, although the issue appears somewhat infrequently. In *Stumes v. Solem*, 752 F.2d 317 (8th Cir.1985), the defendant was requestioned six and one-half hours after warnings were given and five hours after the first interview terminated. The facts strongly suggested, however, that he was well aware of his rights, including: the defendant was an intelligent and articulate adult; the defendant had discussed his rights previously with his attorney; *Miranda* warnings had been provided twice; and the defendant was familiar with the criminal justice system. 752 F.2d at 320.

In evaluating the circumstances of the case, the Eighth Circuit noted that they were consistent with the facts presented in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), with the main difference being the delay between the warnings and the interrogation. Since the circumstances were such that the delay was of no consequence, the Eighth Circuit concluded that the outcome should be the same as in *Mosley*, i.e. the waiver of the rights enumerated in *Miranda* was effective. Specifically, the Eighth Circuit stated:

> To require the police to reissue *Miranda* rights under these circumstances would serve no real purpose. If [the defendant] had thought that the police would ignore his rights even if he asserted them, it is hardly likely that the mere reiteration of the rights would have disabused him of that idea.

*Stumes*, 752 F.2d at 321.

Other courts have concluded that a delay between *Miranda* warnings and interrogation does not automatically render an ensuing statement inadmissible. *See Jarrell v. Balkcom*, 735 F.2d 1242 (11th Cir.) (lapse of four hours did not render warnings "stale" because defendant was aware of his rights, knew that he was a suspect in the case, and was not naive, mentally deficient or pressured), *reh'g denied*, 740 F.2d 979 (11th Cir. 1984), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848, *reh'g denied*, 473 U.S.

921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985); *United States v. Hopkins*, 433 F.2d 1041 (5th Cir.1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (1971) (while warnings are not accorded unlimited efficacy or perpetuity, initial warnings sufficient because time lapse significant, suspect questioned regarding same subject matter, and nothing happened in interim to dilute efficacy of warnings).

One case remarkable for its direct approach to the issue is *United States v. Smith*, 679 F.Supp. 410 (D.Del.1988). In that case, a Delaware State Police corporal stopped the defendant for a minor traffic offense at 11:20 a.m. When a pat-down of the defendant revealed cocaine in the defendant's pants pocket, the defendant was placed under arrest and read his *Miranda* rights. The time of the arrest was 11:25 a.m. The defendant stated that he understood his rights, and there was no reason to question the answer. 679 F.Supp. at 411.

A Delaware State Police trooper arrived on the scene and transported the defendant back to the troop headquarters without discussing the case. The corporal interviewed the defendant at about 12:30 p.m. without repeating the *Miranda* warnings. The defendant provided a statement at that time. *Id.*

The corporal then transported the defendant to the office of the Drug Enforcement Agency (DEA), where he again was interviewed without a repetition of the *Miranda* warnings. The time of the second interview, this one by the DEA special agent, was approximately 2:00 p.m. *Id.*

The defendant moved to suppress both statements. Following a suppression hearing, the district court ruled immediately from the bench that the statement to the corporal was voluntary, but deferred its decision as to whether too much time elapsed prior to the statement to the DEA special agent. In its opinion, the court first reviewed the applicable law, including *Wyrick v. Fields*, 459 U.S. 42, 47, 103 S.Ct. 394, 396, 74 L.Ed.2d 214 (1982), in which the Supreme Court overruled an Eighth Circuit decision establishing a *per se* rule that *Miranda* warnings must be

reissued, and established a totality of the circumstances test. 679 F.Supp. at 412.

The court then reviewed a number of cases in which a delay between *Miranda* warnings and interrogation did not affect the admissibility of a defendant's statement to police, 679 F.Supp. at 412–413, and analyzed the facts of the case as follows:

Considering the totality of the circumstances, the Court concludes that Agent Glanz's failure to repeat the *Miranda* warnings does not mandate suppression of Mr. Smith's statement to Agent Glanz. Approximately two and a half hours elapsed from the time Corporal Durnan gave Mr. Smith the warnings and Agent Glanz's interview. Mr. Smith indicated to Corporal Durnan that he understood his rights, and a gap of two and a half hours is insufficient for Mr. Smith to have forgotten. At no time did Mr. Smith request an attorney or indicate that he did not want to continue talking. Although Mr. Smith was transported from I–95 to Troop 6 and then to the DEA office, nothing occurred during his travels to invalidate his waiver. Neither Corporal Durnan, nor Trooper Thomas, nor Agent Glanz in any way coerced or threatened or made promises to Mr. Smith. Agent Glanz knew that Corporal Durnan had given the suspect his warnings. Importantly, both Agent Glanz and Corporal Durnan questioned Mr. Smith concerning the same subject matter.

679 F.Supp. at 413.

Each of these cases, and especially *Smith*, provides an example of the circumstances under which a suspect may waive his or her rights under *Miranda* despite a lapse of time between *Miranda* warnings and interrogation. Because of the infinite variety of circumstances a case and a suspect may present, a court determining the admissibility of a statement given in such a situation necessarily accords differing weight to a number of potential factors, and a determinative factor may be non-existent in another case. In *Stumes*, for example, an important consideration was the defendant's statements and conduct between the time *Miranda* warnings were provided and the time of the interview. In the interim, the defendant indicated in a number of ways that he continued to know and understand his rights, and so the waiver was valid. In *Smith*, the defendant did nothing more than travel between the offices of the State Police and the DEA, and so had no reason to forget something he knew and understood within the previous two hours.

Based upon a review of these cases, it appears that the question of whether a time lapse renders *Miranda* warnings "stale" may be reduced to answering two questions: (1) At the time the *Miranda* warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

Because of the infinite variety of circumstances which may arise, no court has attempted to set forth a list of requirements which must be met before a statement taken after a delay from the time *Miranda* warnings have been given will be admissible. Pennsylvania courts, however, have applied a list of factors which appears to be extremely helpful in making this determination. These include:

(1) the time lapse between the last *Miranda* warnings and the appellant's statement; (2) interruptions in the continuity of the interrogation; (3) whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the appellant's statement was made; (4) whether the same officer who gave the warnings also conducted the interrogation resulting in the appellant's statement; and (5) whether the statement elicited during the complained-of interrogation differed significantly from other statements which had been preceded by *Miranda* warnings.

*Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1276 (1989) ("the appellant" refers to the defendant in the trial court; quoting *Commonwealth v. Upchurch*, 355 Pa.Super. 425, 513 A.2d 995, 998 (1986), *allocatur denied*, 514 Pa. 630, 522 A.2d 558 (1987) (table);

also citing *Commonwealth v. Ferguson,* 444 Pa. 478, 282 A.2d 378 (1971)). While this list of factors should not be considered exhaustive (indeed, no such list could be), we believe it provides an excellent barometer against which to at least begin the review of the circumstances in a particular case.

In this instance, the exact amount of time between the *Miranda* warning and the interview at which Vasquez gave his statement is not exactly clear, due to the confusion concerning the exact time of the stabbing and the taking of Vasquez into custody. Based upon the testimony both of C.O. Geiswite and the testimony of witnesses at trial, however, it appears that Vasquez was taken to SHU at approximately 5:30 p.m., and the report of the interview prepared by S.A. Thompson so indicates. S.A. Thompson testified that the interview began at 8:47 p.m., so that a delay of between three and three-and-one-half hours occurred.

We do not believe that this delay was overly long. The period of delay is somewhat longer than that in *Smith,* and shorter than that in *Stumes.* Unlike the defendant in *Smith,* however, Vasquez did not even travel between the time the *Miranda* warnings were given and the time of the interview. Instead, Vasquez was locked in SHU, and remained there until the investigators arrived. Nothing can have occurred which would have seriously impacted Vasquez' previously manifested understanding of his rights. Supporting the latter is the repetition of the right to remain silent by Lt. Dollar during the time Lt. Dollar had custody of Vasquez, which would have informed Vasquez and emphasized further that particular right. Moreover, Vasquez was told at the time he was placed in SHU that an investigator would speak with him later, so that the presence of S.A. Thompson and S.I.A. Aponte was not unexpected.

The second factor, the continuity of interrogation, is not particularly applicable, but it should be noted that the interview, which is summarized above, does not appear to have taken a great deal of time, and no interruption of the interview has been indicated by any participant.

The lack of a change in location between the place in which the warnings were given and the interview was conducted weighs heavily in favor of admission of the statement. Vasquez was placed in SHU, an isolated, locked-down section of USP–Lewisburg. He therefore would have had little contact with other persons and no intervening events of significance would have taken place. Also, as noted, Vasquez was made aware that investigators would come to speak to him, and Vasquez specifically asked to see S.I.A. Aponte, albeit purportedly to find out the reason for his detention in SHU and not to make a statement.

In short, Vasquez indicated his understanding of his rights under *Miranda,* a fact supported by his long experience and frequent contact with the criminal justice system dating back over nearly two decades at the time of the stabbing, and his isolation in SHU prevented an occurrence which could have had a deleterious effect on that understanding. In fact, it could well be said that the practical effect of placement in SHU was to render the period of delay negligible.

We recognize the fact that a different law enforcement officer conducted the interview of Vasquez than the corrections officer who provided the *Miranda* warnings. This factor, however, is of little consequence, since Vasquez was informed that a separate officer would come in to interview him, and because Vasquez himself manifested his awareness that such an investigation would be the responsibility of S.I.A. Aponte and not a corrections officer.

Since Vasquez gave no pre-*Miranda* statement which contradicts the statement given to S.A. Thompson and S.I.A. Aponte, the last factor set forth in *Hughes* is inapplicable.

We conclude that, under the circumstances presented, Vasquez made a voluntary, knowing, and intelligent waiver of his right to remain silent, and the period of delay between the time Vasquez was read his *Miranda* rights by C.O. Geiswite and the time of the interview did not render the statement provided by Vasquez inadmissible. Vasquez' objection to the admission of his statement of March 19, 1991, will be denied.

## V. OTHER CONCERNS

We recognize that the ruling on the admissibility of Vasquez' statement is being made after evidence has been presented to the jury for a week. However, no motion to suppress the statement was made, thus requiring a determination during trial. Also, defendant was aware that the statement might be used by the government, and so cannot claim that the testimony of S.A. Thompson is unexpected. The court held a suppression hearing, out of the presence of the jury, at which additional testimony was received.

We also note that our findings of fact reflect a rejection of the testimony of Vasquez at the suppression hearing. This rejection reflects not only a credibility determination concerning C.O. Geiswite and Vasquez, but reflects the fact that corrections officers had testified concerning some of these events even before the admissibility of the statement became an issue. For example, Lt. Dollar already had testified that he had relinquished custody of Vasquez to other staff on the Red Top, while Vasquez testified that Lt. Dollar had escorted him to SHU. Other corrections staff also had testified, before S.A. Thompson's testimony began, that C.O. Bilger and C.O. Geiswite had been the staff members accompanying Vasquez to SHU. The fact that these officers provided their testimony before the importance of the identity of Vasquez' escort became evident weighs heavily in favor of acceptance of C.O. Geiswite's testimony. It is because of the consistency in the testimony of the staff, and not any general bias against inmate testimony, that we credit C.O. Geiswite's testimony over that of Vasquez.

## VI. CONCLUSION

The statement provided by Vasquez to S.A. Thompson and S.I.A. Aponte on March 19, 1991, is relevant as a false exculpatory statement and to rebut the explanation proffered by witnesses for the defense concerning the presence of blood on Vasquez' clothing after the stabbing. It also supports the government contention that defense witnesses' testimony was crafted to comport with physical evidence.

Vasquez voluntarily, knowingly, and intelligently waived his rights against self-incrimination by providing a statement to S.A. Thompson and S.I.A. Aponte after *Miranda* warnings were provided by C.O. Geiswite. Based upon the totality of the circumstances, the delay between the reading of Vasquez' *Miranda* rights and the interview by S.A. Thompson did not render the statement involuntary.

Vasquez' objection to the admission of his statement of March 19, 1991, will be overruled. An appropriate order shall issue.

## ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT** defendant Virgilio Soto Vasquez' objection to the admission of his statement of March 19, 1991, to Special Agent Carlyle R. Thompson of the Federal Bureau of Investigation is overruled.