BOLIN, Justice.
Raphael Jermine Landrum petitions this Court for a writ of certiorari to review the Court of Criminal Appeals’ decision affirming, by unpublished memorandum, the trial court’s decision to allow into evidence Landrum’s inculpatory custodial statement. Landrum v. State (No. CR-08-0229, July 24, 2009), 57 So.3d 204 (Ala.Crim.App.2009) (table). We granted certiorari review to consider whether the Court of Criminal Appeals’ decision conflicts with precedent interpreting Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For the following reasons, we affirm the Court of Criminal Appeals’ judgment.

Facts and Procedural History

Landrum, who was 17 years old at the time of his arrest, was charged with murdering Jimmie McGhee. The trial court denied him youthful-offender status, and Landrum was tried as an adult. The jury found Landrum guilty of the lesser-included offense of manslaughter. See § 13A-6-3(a)(1), Ala.Code 1975. The trial court sentenced Landrum to 20 years, that sen *79 tence was split, and he was ordered to serve 5 years in confinement and the balance was suspended, with 4 years’ probation.
During the trial, Landrum filed a motion to suppress an inculpatory statement he had made to Detective Mack Hardeman of the Mobile Police Department. During the hearing on the motion, defense counsel and the State stipulated to the following facts regarding the statements given by Landrum to Detective Hardeman: On the morning of June 4, 2007, around 8:00 a.m., Landrum voluntarily turned himself in at the headquarters of the Mobile Police Department and was arrested. Detective Hardeman advised Landrum of his Miranda rights and attempted to interrogate him, but Landrum refused to give a statement to Detective Hardeman until his parents arrived. When Landrum’s father arrived, Landrum gave a statement denying his involvement in the death of Jimmie McGhee. Law-enforcement officials then transported Landrum to the Mobile Metro Jail. Landrum’s girlfriend contacted Detective Hardeman and informed him that Landrum wanted to speak with him. On the afternoon of June 6, 2007, between 3:00 p.m. and 4:00 p.m., Detective Hardeman arrived at the Mobile Metro Jail and Landrum confessed to having killed Jimmie McGhee.
The following exchange occurred during the hearing:
“[Landrum’s counsel]: I tell you what. Judge, I don’t think it’s going to be— well, it might be. I was going to say I don’t think it’s going to be necessary for testimony. It’s merely going to be a stipulation to the facts. Let’s see if you can stipulate to it. Let’s see if we can stipulate to the factual portion of it. I think we can.
“The first time — This is my understanding. If you go along with it, tell the Judge. The first time that they interrogated Raphael he went down to the headquarters on his own and that was like 3:00 in the morning on January the 4th — I meant June the 4th. It was like 3:00 o’clock in the morning on June the 4th 2007.
“[Prosecutor]: Uh-huh.
“[Landrum’s counsel]: At that point in time when they first attempted to interrogate him, they Mirandized him and he said I don’t want to talk to anybody until my mama or daddy gets down here, okay? So they’ held off. His daddy comes down. Then they interrogate him. This is early — in- the early morning hours of June the 4th. All right. They send him to Metro. He gives a statement. They send him to Metro. Detective Hardeman then hears from Landrum’s girlfriend, Raphael’s girlfriend, says Raphael wants to talk to you. Come down to Metro. So, [Detective Hardeman] goes down there. He gets down there in the afternoon of June 6th 2007. I think it was somewhere in the neighborhood maybe of 3:30 or 4:00 o’clock.
“CPL. HARDEMAN: As best as I can remember, yeah.
“[Landrum’s counsel]: When he goes down there, I don’t have anything in my discovery that tells me or that I see where he re-Mirandized him at that time, and we’re talking about from 3:00 o’clock in the morning on June 4th until somewhere between 3:30 and 4:00 o’clock on the afternoon of June 6th. That’s not a tremendous span of time, I understand but you’ve got to realize we’re dealing with a challenged 17-year-old here. And he may — you may have re-Mirandized him, but it’s not in the transcript. It’s not in the recording or anything where you re-Mirandized him. All you did was tell him that you *80 came down there because his girlfriend called. So, you know, if you re-Miran-dized him—
“CPL. HARDEMAN: I did not re-Mirandize him. I believe when I first walked in, I said, remember the rights I read you before, and I keep the recorder in my pocket and I turned the recorder on. And I don’t know if I said that before or after the statement. I don’t think it’s on the transcribed statement, but I would have said that. Having read someone their rights previously, I don’t always go back and reread them their rights.
“[Landrum’s counsel]: Okay.
“THE COURT: How old was [Land-rum] at the time the statement was taken?
“[Landrum’s counsel]: He was 17.
“CPL. HARDEMAN: Yes, sir.
“[Landrum’s counsel]: And challenged.
“[Prosecutor]: When you say ‘challenged,’ Claude, I mean—
“[Landrum’s counsel]: I think he’s somewhere in the neighborhood of a few points below the line. I think he’s going to be a few points or more below 72. The reason I say that is because I’ve been dealing with him. I’ve dealt with the discovery. I don’t have a certificate from a doctor, but I can just tell you right now—
“THE COURT: That’s alright.
“[Prosecutor]: Judge, when you looked at his record for [youthful-offender status], you can see that he completed school. There is no — He’s not pleading guilty by reason of insanity or anything.
“[LandnmTs counsel]: He quit school in the 8th grade and he never got a GED. I’m not using that as—
“THE COURT: I mean, I think you have to just — That’s not really for me to decide now. I mean, not many people I see down here on the criminal docket have got Phi Beta keys hanging around them necks. So, the legal proposition is if you have a 17-year-old who is properly Mirandized — Did you give him just the regular adult Miranda or did you give him the juvenile Miranda?
“CPL. HARDEMAN: The juvenile Miranda, Your Honor.
“THE COURT: Okay. So, you gave him juvenile Miranda, apparently, early hours a.m. on the 4th. So, 48 hours plus a few later, depending on what time in the afternoon you went down there — Am I doing that right?
“CPL. HARDEMAN: Roughly, 36 hours or 48—
“[Landrum’s counsel]: June 4th to June 5th is 24. 5th to the 6th is 48, and then you’ve got from 3:00 o’clock in the morning on the 6th up till 4:00 in the afternoon. So, that’s almost another— well, it is another 12 hours. That’s what, 60 hours?
“THE COURT: So, if a person is properly juvenile Mirandized, refuses to give a statement unless one of his parents is there, they wait, parent comes, statement is taken on the early morning of the 4th. And then at sometime thereafter, word is received that [Landrum] wants to again talk to the police. They go back and inquire as do you remember the rights I read you before. Yes. Do you still want to talk to me or words to that effect. Yes. And a second statement was taken. So, I guess the legal proposition is what period of time for a juvenile has to lapse before it’s necessary to re-Mirandize them and have them sign waivers, et cetera.”
The hearing continued, with the lawyers making them arguments. Ultimately, the trial court concluded that Landrum’s state *81 ment made in the afternoon of June 6 should be not be suppressed.

Discussion

The Fifth Amendment to the United States Constitution provides that “[n]o person ... shall be compelled in any criminal case to be a witness against himself.” U.S. Const. Amend. V. In Miranda, the United States Supreme Court held that the right against self-incrimination “is fully applicable during a period of custodial interrogation.” 384 U.S. at 460. The Supreme Court in Miranda further held that “the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege.... ” 384 U.S. at 469. Before a custodial interrogation, a suspect must be informed of these rights, now commonly referred to as Miranda rights. 384 U.S. at 444 (“Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.”). The Supreme Court in Miranda recognized that “the defendant may waive effectuation of these rights, provided that the waiver is made voluntarily, knowingly, and intelligently.” Id.
Two factors affect the determination of whether a defendant has waived these rights:
“First, the relinquishment of the right must have been voluntary in the sense that it was the product of a' free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the ‘totality of the circumstances surrounding the interrogation’ reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.”
Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). In Wyrick v. Fields, 459 U.S. 42, 48-49, 103 S.Ct, 394, 74 L.Ed.2d 214 (1982), the United States Supreme Court rejected a per se rule requiring police to readvise a suspect of his Miranda rights before questioning him about results of a polygraph examination, when he had requested the polygraph examination and had waived those rights in writing before taking the examination, in favor of a more flexible approach focusing, on the totality of the. circumstances. “[T]he circumstances [had not] changed so seriously that his answers no longer were voluntary, or ... he no longer was making a ‘knowing and intelligent, relinquishment’ of his rights.” Wyrick, 459 U.S. at 47 (quoting Edwards v. Arizona, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). “[T]he questions put to [the defendant] after the examination would not have caused him to forget the rights of which he had been advised and which he had understood moments before.” Wy-rick, 459 U.S. at 49.
The issue in this case is whether the Miranda warnings given to Landrum became stale or were too remote based on the facts of this case.
“It is well settled that once Miranda warnings have been given and a waiver made, a failure to repeat the warnings before a subsequent interrogation will not automatically preclude the admission of the inculpatory response. Fagan v. State, 412 So.2d 1282 (Ala.Crim.App.1982); Smoot v. State, 383 So.2d 605 (Ala.Crim.App.1980).”
*82 Hollander v. State, 418 So.2d 970, 972 (Ala.Crim.App.1982). “Whether Miranda warnings should be given before each interrogation must depend upon the circumstances of each case. The length of time and the events which occur between interrogations are relevant matters to consider.” Jones v. State, 47 Ala.App. 568, 570, 258 So.2d 910, 912 (1972).
“ ‘Once the mandate of Miranda has been complied with at the threshold of the questioning it is not necessary to repeat the warnings at the beginning of each successive interview.’ Gibson v. State, 347 So.2d 576, 582 (Ala.Cr.App.1977). See also Cleckler v. State, 570 So.2d 796 (Ala.Cr.App.1990).
“ ‘An accused may be read the Miranda rights prior to one interrogation but not confess until a later interrogation during which there was no rereading of the Miranda warning. As a general rule, it has been held that Miranda warnings are not required to be given before each separate interrogation of a defendant after an original waiver of the accused’s rights has been made. However, if such a long period of time has elapsed between the original Miranda warning and the subsequent confession that it can be said that, under the circumstances, the accused was not impressed with the original reading of his rights in making the ultimate confession, then the confession should be held inadmissible.’
“C. Gamble, McElroy’s Alabama Evidence, 201.09 (5th ed.1997) (footnotes omitted). See Phillips v. State, 668 So.2d 881, 883 (Ala.Cr.App.1995).”
Powell v. State, 796 So.2d 404, 414 (Ala.Crim.App.1999).
In Ex parte J.D.H., 797 So.2d 1130 (Ala.2001), J.D.H. was arrested and charged with first-degree sodomy and first-degree sexual abuse. Officers advised him of his Miranda rights; he waived those rights, and he agreed to speak with police. He said nothing incriminating, but he agreed to take a polygraph examination. He was placed in jail. Sixteen days later he was brought to the courthouse to take the polygraph examination. The individual who administered the polygraph, an employee of the Alabama Bureau of Investigation, conducted a prepolygraph interview. J.D.H. received no Miranda warnings before that interview, and no one reminded him of his previous waiver. The prepoly-graph interview consisted of a written questionnaire. The questionnaire asked J.D.H. detailed questions about the allegations against him and asked for possible explanations for those allegations. The polygraph éxaminer also spoke with J.D.H., telling J.D.H., as he tells all the persons he examines, that he did not know whether J.D.H. was guilty and that, if he were guilty, he should not to. take the polygraph examination. J.D.H. then told the polygraph examiner that he did not want to take the examination. The examiner called the police investigator back to the examination room at J.D.H.’s request. The investigator then took a statement from J.D.H. that amounted to a confession. At no time was J.D.H. told that the polygraph results would be inadmissible in court, that he still had a right to remain silent, or that he had the right to consult an attorney.
With regard to the amount of time elapsed between the Miranda warnings and the interrogation in J.D.H., this Court stated:
“This Court recognizes that the Court of Criminal Appeals has a line of cases holding that once Miranda warnings have been given and the defendant has made a knowing, intelligent, and voluntary .waiver, a failure to repeat the warn *83 ings will not automatically preclude the admission of an inculpatory statement. See Hollander v. State, 418 So.2d 970 (Ala.Crim.App.1982) (between 1 and 1.75 hours passed while police were searching house; no repeat of Miranda warnings); Fagan v. State, 412 So.2d 1282 (Ala.Crim.App.1982) (lapse of 3 1/2 hours did not require a renewed warning); Smoot v. State, 383 So.2d 605 (Ala.Crim.App.1980) (lapse of 30 minutes between the warnings and the statement); Burlison v. State, 369 So.2d 844 (Ala.Crim.App.1979) (lapse of 45 minutes between the reading of Miranda warnings and the taking of a statement did not require a repeat of the warnings); Johnson v. State, 56 Ala.App. 583, 324 So.2d 298 (1975) (three to four days, with a reminder of the warnings); Jones v. State, 47 Ala.App. 568, 258 So.2d 910 (1972) (warning was given one day and statement made the following morning). However, we note that in most- of those cases the time lapse was not more than a few hours. In none of those cases did the lapse exceed a few days without at least a reminder of the warnings. See Johnson v. State, supra.”
797 So.2d at 1131-32. However, this Court in J.D.H. emphasized other circumstances, besides the amount of time, that warranted suppressing the statement. The Court stated:
“The time that passed between the date J.D.H. was given the Miranda warnings and the date he made the confession was 16 days, or 2 weeks and 2 days. It is this Court’s opinion that after two weeks the warnings ordinarily will have lost their efficacy. However, this Court has stated that in determining whether a confession was voluntary a court should look to the totality of the circumstances. McLeod v. State, 718 So.2d 727 (Ala.), on remand, 718 So.2d 731 (Ala.Crim.App.), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998). The lapse of time in this case, considered in the context of the circumstances surrounding the confession, required that the evidence regarding that confession be excluded, there being no showing that the defendant had received a new warning before he made the confession.
“The defendant agreed to take a polygraph examination when he was first arrested. The record does not indicate that he had any control over when the exam would be given. On November 22, 1996, J.D.H. was taken from the jail to the courthouse. At the courthouse, he met [the polygraph examiner] and filled out' the prepolygraph written questionnaire. The questions on that form asked specifically about the charges against him and asked him to admit or to deny the allegations and to provide possible explanations. When [the polygraph examiner] reviewed the forms and then ‘advised’ J.D.H. that he should not take the test if he was guilty, [the polygraph examiner] did not tell J.D.H. that the test results were inadmissible. When [the polygraph examiner] advised J.D.H. not to take the test if he was guilty, he did not say that J.D.H. could refuse to take the test by opting to ‘remain silent.’ Nor did [the polygraph examiner] tell J.D.H. that remaining silent was still an option. Instead, when J.D.H. said he did not want to take the test, [the polygraph examiner] told [the investigator] that J.D.H. had ‘confessed.’
“These actions were designed to elicit an incriminating response. See Rhode Island v. Innis, 446 U.S. 291, 292, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (police action constitutes interrogation if the actions or words are ‘reasonably likely to elicit an incriminating response’). These actions overbore any will J.D.H. may have had to remain silent and not in *84 criminate himself. The State argues that because no one promised anything to J.D.H. the actions of [the polygraph examiner] and [the detective] were not coercive. However, their actions were far more coercive and overbearing than a mere mention of leniency. The officers removed J.D.H.’s choice to be silent. They backed him into a corner. If J.D.H. took the test and failed it, [the polygraph examiner] would ‘know’ J.D.H. was guilty; if J.D.H. chose not to take the test, by choosing to remain silent, then [the polygraph examiner] would know that he was guilty. In. fact, [the polygraph examiner] took J.D.H.’s refusal to take the test to be a ‘confession,’ and that refusal was then used to cause him to feel that he had no choice but to confess. [The polygraph examiner] used the defendant’s choosing to remain silent to coerce him into confessing.
“The purpose of a Miranda warning is to ensure that any waiver of the right against self-incrimination is a knowing, intelligent, and voluntary one. There was nothing voluntary about J.D.H.’s waiver of his right to remain silent.”
Ex parte J.D.H., 797 at 1132-33.
Other courts have, in addressing whether Miranda rights have become stale, focused on the circumstances surrounding the interrogation. In Jarrell v. Balkcom, 735 F.2d 1242 (11th Cir.1984), Jarrell confessed to murder, kidnapping, armed robbery, and aggravated assault approximately three hours after receiving his Miranda warnings from a police investigator at city hall. Jarrell was never readvised of his rights, even after being arrested. From the time Jarrell received his Miranda warnings until he confessed, Jarrell was escorted from city hall to police headquarters, where he was interviewed by a police sergeant, driven from headquarters to the district attorney’s office, where a polygraph examination was administered, then driven back to police headquarters, where he was arrested by the same police sergeant, and interrogated for an additional 30 to 45 minutes by the sergeant before confessing. Jarrell argued that the Miranda waimings should have been refreshed and that, therefore, the confession was inadmissible.
“Under the circumstances of this case, we do not view a confession given less than four hours after the issuance of Miranda warnings inadmissible because of the failure to reissue the warnings. Although Jarrell was not technically in custody until he was arrested, he was a suspect from the moment he received his warnings. The record reflects that the warnings given were complete and that Jarrell understood them. Cf. Edwards v. Indiana, 412 N.E.2d 223, 225-26 (Ind.1980) (where defendant, not yet a suspect, was given orally his Miranda warnings and record contained no evidence of content of oral advisement, confession given 5 hours later when defendant had become a suspect not admissible). Furthermore, the fact that Jarrell confessed to a state officer (Blannott) other than the one who administered the Miranda warnings (Bishop), does not render the warnings insufficient, especially since, before interrogating Jarrell, Blannott asked Bishop in Jarrell’s presence whether petitioner had received his Miranda warnings. (T.T. 545). See State v. Gallagher, 36 Ohio App.2d [2]9, 301 N.E.2d 888 (1973) (change from one state interrogator to another insufficient break to require fresh warnings). Cf. United States v. Hopkins, 433 F.2d 1041 (5th Cir.1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (1971) (change from state police officer questioning defendant about state crime to *85 federal officer questioning about federal crime; no new warnings required); Mitchell v. State, 3 Tenn.Cr.App. 153, 458 S.W.2d 630 (1970) (questioning regarding different crime occurred on following day; no new warnings required). We conclude that no violation of petitioner’s rights occurred by the failure to reissue the Miranda warnings at the time of arrest because the totality of the facts do not reflect that Jarrell was unaware of his rights, that he was pressured, or that he was mentally deficient or naive about the process that was under way. Additionally, Jarrell had had previous experience with law enforcement officers where his rights were explained.”
735 F.2d at 1254.
In Martin v. Wainwright, 770 F.2d 918, 930 (11th Cir.1985), modified on other grounds, 781 F.2d 185 (11th Cir.1986), the United States Court of Appeals for the Eleventh Circuit determined that the defendant’s Miranda rights had not been violated when he made his second confession, even though the defendant had waived his Miranda rights one week earlier and the police did not fully readvise him of his rights. 770 F.2d at 930-31. Before the second interrogation, the defendant was given a detailed reminder of his Miranda rights. In reaching its conclusion, the court relied on the fact that the defendant had been “fully warned, and knowingly and intelligently waived his Miranda rights,” and that, during the second interrogation, he “indicated that he understood those rights.” 770 F.2d at 930.
United States v. Jones, 147 F.Supp.2d 752 (E.D.Mich.2001), involved a defendant who was arrested following a search of an automobile in which he was a passenger. He was read his Miranda rights at 11:23 p.m. on February 14, 2001, by a police sergeant, and he waived those rights. .He gave inculpatory statements to the sergeant late on the night of February 14 or early in the morning of February 15. The defendant next met with a Drug. Enforcement Administration (“DEA”) Task Force agent on February 15, 2001, between 6:00 and 7:00 p.m. The DEA agent did not think the defendant’s Miranda rights were reread to him before the second interview. With regard to whether the defendant’s Miranda warning had become stale, the court stated:
“The. question thus becomes whether the passage of time between Defendant’s being provided with his Miranda rights on February 14 and his interview with [the DEA agent] on February 15 rendered his Miranda warnings stale. There is no blanket rule for when police must remind a suspect of his Miranda rights, and the mere elapse of time does not necessarily dictate.that police give fresh warnings. See United States v. Weekley, 130 F.3d 747, 751 (6th Cir.1997). Instead, the inquiry comes down to two questions: (1) whether, when he received his Miranda warnings, Defendant knew and understood his rights; and (2) whether anything happened between the warnings and Defendant’s in-culpatory statements, including the passage of time or any other intervening event, that rendered Defendant unable to fully consider the effect of an exercise or waiver of those rights before speaking with police. United States v. Vasquez, 889 F.Supp. 171, 177 (M.D.Pa.1995).
“[The police sergeant’s] uncontradict-ed testimony was that Defendant understood his rights under Miranda, as evinced by Defendant’s signing of the Miranda waiver. The Court finds this testimony credible and concludes that Defendant knew and understood his rights when he received his Miranda warnings.
*86 “More than eighteen hours had passed, however, between the Miranda warnings that [the police sergeant] gave Defendant on February 14 and Defendant’s interview with [the DEA agent] on February 15. During that period, there was an interruption in the continuity of the interrogation, as [the police sergeant] had ceased his questioning at 1:13 a.m. on February 15 and [the DEA agent] did not begin his interview earlier than 6:00 p.m. (Hrg. Tr. at 90:8.) There was a change in location between the interview that [the police sergeant] conducted and the interrogation done by [the DEA agent]. The former was at the police station; the latter was at the federal building. (Hrg. Tr. 89, 105.). [The DEA agent] who conducted the interview of Defendant on February 15, was not the same officer who administered the warnings on February 14. All of these factors militate toward the conclusion that Defendant could not fully appreciate a waiver of his Miranda rights when he spoke to [the DEA agent] on February 15 and that his statements to [the DEA agent] must therefore be suppressed. See Commonwealth v. Dixon, 475 Pa. 365, 380 A.2d 765, 767-69 (1977). The Court apprehends no factors militating toward the opposite conclusion.
“Considering the totality of the circumstances, the Court holds that Defendant’s Miranda warnings were stale when he spoke to [the DEA agent] on February 15. The Court will order suppressed any inculpatory statements that Defendant made to [the DEA agent] during their interview on February 15.”
147 F.Supp.2d at 761-62.
In United States v. Pruden, 398 F.3d 241, 246-47 (3d Cir.2005), the defendant was arrested by Alcohol, Tobacco, and Firearm (“ATF”) agents at a routine meeting with his probation officer on January 14, 2003. He was questioned by two ATF agents. Before questioning, the defendant was asked if he was willing to talk, and, upon receiving an affirmative answer, one of the agents read the defendant his Miranda rights. The defendant indicated that he understood his rights and did not ask a question or request a lawyer. The defendant agreed to answer the. ATF agents’ questions. The ATF agents questioned the defendant for about half an hour. He admitted that he had gone to a gun shop and that he examined some guns, but he denied that either of the people with him had attempted to buy guns for him. The agents took the defendant to a federal detention center, where he spent the night. The next morning, January 15, 2003, one of the ATF agents who had originally questioned the defendant and another ATF agent drove the defendant from the jail to the courthouse for an initial hearing. The original ATF agent explained the booking procedures to the defendant and informed him that the prosecutor planned to ask the magistrate judge to detain him before trial. The original ATF agent indicated to the defendant that, if there was anything else he had to say, he should say it because, after the initial appearance, it would be too late. The original ATF agent then reminded the defendant that had read him his Miranda rights and asked the defendant if he remembered his rights. The defendant agreed to answer questions during the ride to the courthouse. The defendant then made statements that differed from his original statements. The defendant later argued that his second waiver on January 15 was not knowing or intelligent The court addressed the issue of stale Miranda warnings as follows:.
“[T]he question whether a suspect needs to be warned when questioning resumes boils down to whether the suspect can *87 and does effectively waive his Miranda rights at the second questioning. As Judge McClure has aptly put it,
“ ‘the question of whether a time lapse renders Miranda warnings “stale” may be reduced to answering two questions: (1) At the time the Miranda warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?’
“United States v. Vasquez, 889 F.Supp. 171, 177 (M.D.Pa.1995). We now adopt this eminently sensible framework for analyzing the effect of delays between Miranda warnings and custodial statements.
“The first question is whether Pruden knew and understood his rights at the time the Miranda warnings were given on January 14. As explained above, we think that the answer to this question must be yes. The second question -is whether the passage of time or an intervening event rendered Pruden unable to effectively waive his Miranda rights when he was questioned again the following morning. A significant amount of time passed between the Miranda warnings and Pruden’s January 15 statement: the record does not reflect the exact amount, but it seems that Pru-den was arrested in the afternoon on January 14 and questioned again in the morning of January 15, suggesting a time lapse of perhaps twenty hours. This is longer than the periods involved in [Guam v.] Dela Pena[, 72 F.3d 767 (9th Cir.1995) ] (fifteen hours) and Vasquez (three hours), and does seem to be at the upper end . of the permissible range. On the other hand, Agent Kusheba specifically reminded Pruden of his rights before resuming questions, and Pruden responded that he understood his rights, did not ask Kusheba to repeat them, and was willing to answer questions.
“Beyond the passage of time, we can find no other relevant event that could have lessened the effectiveness of Pru-den’s Miranda waiver.- There are no allegations of mistreatment, intimidation, or deprivation of food or sleep during the intervening detention. On both January 14 and January 15, Pruden was questioned by the same ATF Agent, Kusheba, about the same offenses. The charges were not escalating, see United States v. Marc, Crim. No. 96-76-SLR (D.Del.1997) (suppressing statement taken 10 hours after Miranda warnings when suspect was arrested and warned for misdemeanor drug possession, but later questioned about felony firearm charges), and there were no surprises that might have confused Pruden. Nor is there any reason to think that the circumstances of the questioning — in a police car on the way to court — were particularly intimidating. Pruden points out that he had ‘literally no choice but to stay with the agents’ during this questioning. That is true, but we cannot see how that fact distinguishes this questioning from any other custodial interrogation.
“Finally, Pruden alleges that Agent Kusheba deceived him into waiving his rights by suggesting that he should make a statement before the initial appearance, at which point ‘it would be too late.’ Agent Kusheba'apparently meant that, if Pruden had nothing else to say before the appearance, the prosecutor would move to have him detained before trial. As this appears to have been true, *88 it is difficult to see how it constitutes deception. Furthermore, there is no evidence that Kusheba’s statement coerced Pruden, who unhesitatingly agreed to talk.
“The relatively long time between the Miranda warnings and the statement at issue, the change of location, the differences between Pruden’s January 14 and 15 statements, and the lack of independent corroboration of Pruden’s waiver are considerations that might counsel against finding an effective Miranda waiver during the January 15 questioning. These factors make this a fairly close case. Ultimately, however, we think that the changed circumstances were not enough to impair Pruden’s ability to make a knowing and voluntary Miranda waiver. Because Agent Kusheba reminded Pruden of his Miranda rights, albeit without repeating those rights in full, and because Pruden plainly remembered the warnings and unhesitatingly agreed to talk, we hold that his statement was made pursuant to an effective Miranda waiver, and should not have been suppressed.”
Pruden, 398 F.3d at 246^48.
 In the present case, 60 hours had elapsed between the time Landrum had been given his juvenile Miranda warnings and the time he confessed.[1] Detective Hardeman had given Landrum the Miranda warnings in the early morning of June 4, 2007, after Landrum turned himself into the police department. Nothing indicated that Landrum did not understand the Miranda rights read to him.[2] Landrum refused to talk until one of his parents arrived. Landrum’s father arrived, and Landrum denied being involved in McGhee’s death. Landrum was then taken from the police department to the police station. Landrum’s girlfriend contacted Detective Hardeman and told him that Landrum wanted to speak with him. On the afternoon of June 6, 2007, Detective Hardeman spoke with Landrum and Landrum confessed to the killing. Detective Hardeman did not advise Landrum of his Miranda rights again when he met with Landrum on the afternoon of June 6, 2007. Instead, Detective Hardeman reminded Landrum that he had read the Miranda rights to him earlier. Detective Hardeman stated that he did not know if he reminded Landrum of his Miranda lights “before or after the [second] statement.” At first glance, this statement appears to be internally inconsistent — i.e., a *89 reminder of Miranda warnings after a statement is taken would be a useless gesture. However, the more reasonable interpretation taken in the context of Detective Hardeman’s testimony, and the one apparently taken by the trial court, is that Detective Hardeman reminded Landrum of his Miranda rights before he turned on his tape recorder. This is supported by the fact that, if he reminded Landrum after the statement, then the reminder would have appeared in the statement. That the trial court made this determination is supported by the court’s statement at the conclusion of the hearing on the motion to suppress:
“[THE COURT]: So, if a person is properly juvenile Mirandized, refuses to give a statement unless one of his parents is there, they wait, parent comes, statement is taken on the early morning of the 4th. And then at sometime thereafter, word is received that [Landrum] wants to again talk to the police. They go back and inquire as do you remember the rights I read you before. Yes. Do you still want to talk to me or words to that effect. Yes. And a second statement was taken. So, I guess the legal proposition is what period of time for a juvenile has to lapse before it’s necessary to re-Mirandize them and have them sign waivers, et cetera.”
Since the tape-recorded statement does not contain Detective Hardeman’s reminder regarding the Miranda warning, then Detective Hardeman apparently reminded Landrum of his Miranda rights before turning on his tape recorder and taking his statement.
Based on the totality of the circumstances, we conclude that Landrum’s Miranda warnings were not stale when he spoke to Detective Hardeman on June 6, 2007. Landrum understood his Miranda rights on June 4, 2007, when those rights were originally read to him. Pursuant to those rights, he refused to make a statement until one of his parents arrived at the police station. Although 60 hours elapsed from the time Landrum was first read his rights, it was Landrum that reinitiated contact with the same officer who had originally interviewed him on June 4, 2007.[3] There was a change in the location of the interviews from the police department to the city jail, and. Landrum’s original denial of involvement changed to an admission that he was involved. Landrum was reminded of his Miranda rights. We cannot say that the Miranda warnings became so stale as to fail to protect Land-rum from the coerciveness inherent in a custodial interrogation.
Based on the foregoing, we affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
COBB, C.J., and LYONS, WOODALL, STUART, SMITH, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in the result.

. Rule 11(B) of the Alabama Rules' of Juvenile Procedure, effective at the time of Landrum’s arrest, and since rescinded, lists the “Rights of a Child Before Being Questioned While in Custody.” The interrogator must inform a juvenile of these rights before questioning him on "anything concerning the charge” for which he was arrested. They include "the right to'communicate” with the child's counsel, parent, or guardian and, if he or she is not present, "if necessary, reasonable means will be provided for the child to do so.” These rights are now provided for in § 12-15-202, Ala.Code 1975, a part of the new Juvenile Code.

.
"The totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interro-gallon of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits — indeed, it mandates — inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."
Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

. The present case is distinguishable from Ex parte Williams, 31 So.3d 670 (Ala.2009), in which the defendant, who had invoked his Fifth Amendment right to counsel during interrogation, had raised the issue whether a third party could initiate further interrogation by the police.